FRED B. R. UNGER, complainant,

*v.*

NEWLIN HAINES COMPANY, defendant.

---

JAMES R. ADAMS, administrator, &c., complainant,

*v.*

JOSEPH KAHRS et al., defendants.

[Submitted December 11th, 1922.   Decided March 5th, 1923.]

1. The N. H. Company was adjudged a bankrupt.   Certain stockholders, preferred and common, deposited their stock with a depositary, under a protective agreement, which appointed a committee and gave to the committee the legal title and control of the stock deposited, with no limitation on the powers of the committee to do whatever in their judgment would promote the best interest of the depositors. The agreement further provided that in the event of a sale of the property of the N. H. Company that the committee could purchase the property and apply the stock deposited toward the payment of the purchase price.—*Held*, first, that the mutual covenants made between the depositing stockholders, and each other, and the committee, and

the depositary set forth in the agreement and a supplement thereto, constitute a good and valuable consideration for the agreement; second, that the powers conferred upon the committee in the agreement are real powers coupled with an interest, and stockholders becoming parties to the agreement cannot revoke or modify the same except in the manner provided in the agreement.

2. Stockholders who voluntarily enter into an agreement among themselves for their protection by depositing their shares of stock with a depositary, divesting themselves of the title to the stock deposited, appointing a committee to act for them, placing the title of the stock in the committee to do with it as their judgment dictates, are bound by the provisions of the agreement.

3. Where a protective committee has acted within the powers conferred upon them by an agreement, the donors of those powers cannot nullify the obligation of a contract entered into by the committee with a third party under the express powers given to the committee by the donors.

4. The court of chancery cannot disturb contract rights.

On appeal from an order of the court of chancery.

*Mr. Martin P. Devlin* and *Messrs. Wall, Haight, Carey & Hartpence,* for J. Hector McNeal, defendant-appellant.

*Messrs. Katzenbach & Hunt,* for the Newlin Haines Company Stockholders' Protective Committee, defendant-appellant.

*Mr. Carlton Godfrey* and *Mr. Lewis Starr,* for Carlton Godfrey and others, petitioners-respondents.

*Messrs. Scammell & Besore,* for James R. Adams, Admr., &c., et al., complainant-respondent.

*Mr. Martin V. Bergen,* for Norman Grey, Esq., receiver of Newlin Haines Company.

The opinion of the court was delivered by

Katzenbach, J.

This is an appeal of Joseph Kahrs, and others, constituting the Newlin Haines Company Stockholders' Pro-

tective Committee (hereinafter referred to as the committee), from an order of the court of chancery, dated August 7th, 1922, which enjoins the committee from borrowing upon the shares of the capital stock of the Newlin Haines Company (hereinafter referred to as the company), deposited with the committee by any stockholder who dissents from the use of the stock deposited by him for the purpose of carrying out the provisions of an agreement dated April 14th, 1922, made between the committee and J. Hector McNeal, relative to the purchase of the St. Charles Hotel property at Atlantic City, and from using any moneys which may have been borrowed by the committee on such shares for the purpose mentioned. The order further directs that the receiver of the company send a circular letter to each depositing stockholder informing him of the agreement mentioned and requesting each stockholder to elect to agree or disagree to the purchase, to the end that those who assent may receive the shares of stock provided by the committee's plan, and those who dissent may receive a cash dividend from the proceeds of the sale of the St. Charles Hotel property made under a prior order of the court of chancery. The order further provided for the sending of a copy of the agreement mentioned to each stockholder and the holding in abeyance of the consummation of the sale of the property until the further order of the court.

Before considering the question of the legal soundness of the order appealed from, it is necessary for a proper understanding of the questions involved to give a brief history of the circumstances which led up to the making of the order.

The Newlin Haines Company is a New Jersey corporation and was the owner of the St. Charles Hotel property. In 1918 the company was adjudged a bankrupt in involuntary proceedings. On October 14th, 1918, a stockholders' protective committee was organized. An agreement was drafted and circulated among the stockholders. After reciting the circumstances making necessary the formation of a protective committee and the benefits of united action, the agreement provided that any preferred or common stockholder of the company could become a party to the agreement by depositing

his stock certificate or certificates with the depositary, the Commercial Trust Company of Philadelphia. Proper instruments of transfer were to accompany the certificates deposited. Certificates of deposit were to be issued by the depositary to the depositing stockholders. The stock so deposited was to be held by the depositary subject to the direction and control of the committee as if the committee were the legal owners thereof. The committee was vested with the legal title to and ownership of all the deposited stock, with no limitation imposed on the powers of the committee to do whatever in their judgment would promote the best interest of the depositors. The committee was also empowered to sell the deposited stock at such price, whether in cash and (or) other securities and property, and (or) upon such terms as the committee, in its discretion, should deem advantageous. In case the property should be acquired by the committee the agreement authorized the committee to sell the same for such price, in cash or securities, as the committee might think advisable, or to cause to be formed a new corporation and to transfer the title of the property to such corporation for stock or cash, or both, as the committee might deem for the best interest of the depositors. The agreement further provided a method for making amendments thereto. The above are the important features of the agreement. From these provisions can be read the broad powers given to the committee. The purpose of these powers was to enable the committee to do those things which in their judgment were for the best interest of the depositing stockholders.

On October 20th, 1921, under the provisions relating to amendments set forth in the original agreement of October 14th, 1918, a supplemental agreement was made which confirmed the vesting of the complete title of ownership of the deposited stock in the committee with no limitation upon the committee in doing whatever in their judgment would best protect the depositors, and this without prior notice to the depositors.

For upwards of three years after the making of the agreement of October 14th, 1918, the committee was active in

endeavoring to conserve the assets of the company by preventing a sale of the property. In these efforts the committee was successful. In the meantime the property had been successfully operated. Interest on mortgage encumbrances, aggregating over $700,000, and current taxes were paid. The property enhanced in value. In 1921 it was thought that the assets of the company were in excess of its liabilities. The charter of the company had been forfeited by the state for the company's failure to pay its franchise taxes. An application was made to the court of chancery during the pendency of the bankruptcy proceedings for the appointment of a receiver. The application was granted. Norman Grey, Esq., on July 19th, 1921, was appointed receiver. The committee and Mr. McNeal raised funds to the amount of $140,000, and purchased receiver's certificates to this amount. This enabled the receiver to terminate the bankruptcy proceedings by the payment of the debts of the company and the expenses of the bankruptcy proceedings. The receiver has since been operating the property profitably. The charter of the company was reinstated.

From what Mr. McNeal had already done to assist in terminating the bankruptcy proceedings, it was apparent that he was interested in acquiring the property. In order to take the property out of the hands of the receiver, to rehabilitate it, and to provide sufficient funds for these purposes and for working capital, the committee, under date of February 10th, 1922, made two agreements with Mr. McNeal. One agreement was for the purpose of redeeming the property from the receiver. The other agreement provided for the formation of a new company and the merger of the new company with the old company, the creation of new securities for the financing of the company created by the merger and for delivery to the preferred and common stockholders of the old company in the amounts provided by the agreement. These agreements made it necessary that the company be taken out of the hands of the receiver. To this end a petition was filed in the court of chancery. Two objectors then appeared. One, Carlton Godfrey, claiming to hold two shares of undeposited stock, the

other, James R. Adams, administrator of the estate of James Clendenin. Clendenin had deposited all his stock under the agreement of October 14th, 1918, and had been, during his lifetime, chairman of the committee. It is unnecessary to consider the merits of the contentions made by these two objectors. It is sufficient to say that they were successful in preventing the redemption of the property. The chancellor, at the time of the denial of the petition, directed by the same order a public sale of the property to be made by the receiver. From this order or decree no appeal was taken. In pursuance of the instructions of the chancellor the receiver, on April 22d, 1922, sold the property. It was purchased by the committee for the sum of $1,463,000. The sale was confirmed by the chancellor. The committee had bid this amount under the direction of Mr. McNeal, who, on April 14th, 1922, had entered into an agreement with the committee, which provided for the formation of a corporation to be known as the St. Charles Hotel Company, with an issue of $500,000 of seven per cent. preferred stock, ten thousand shares of common stock of no par value, $3,000,000 of bonds, to be secured by a mortgage upon the property if purchased by the committee. Payment to the committee was to be made in the securities of the new company. The further portions of the agreement are not necessary at this time to be stated as they principally relate to details of the plan of reorganization set forth in the agreement. Again Mr. Carlton Godfrey appeared as the holder of a certificate of deposit for one share of the preferred capital stock of the company (Newlin Haines Company), and filed a petition seeking to have the amount due upon his one share to stock paid in cash. He questioned the right of the committee to apply deposited shares towards the payment of the purchase price of the property. Mr. Godfrey, in his petition, upon information and belief, alleged misconduct and fraud on the part of the committee and others. The petition prayed for an injunction against the committee to restrain their use of the stock deposited either as collateral for borrowing or for use as a credit in settling with the receiver, &c. This petition was fully answered. The answers are supported by affidavits

of those having knowledge of the facts and completely refute the charges of fraud and misconduct alleged in the petition.

Mr. James R. Adams, administrator of the estate of James Clendenin, again came forward as an objector. He filed a bill of complaint in the court of chancery in which he alleged lack of notice from the committee of those things intended to be done by them, and the insolvency of the Clendenin estate. The bill further set up the contention that the complainant was not bound by the acts of the committee and that he had a right to claim and did claim payment in cash for the distributive share to which he would be entitled from the proceeds of the receiver's sale. The theory of the bill appeared to be that as the Clendenin estate was insolvent and cash would be better for the purpose of settling with the creditors of the estate than the securities which the estate would get in the plan of reorganization, that the complainant was entitled to cash. The bill was fully answered. The chancellor consolidated the petition of Mr. Godfrey and the bill filed by Mr. Adams. Both were heard together. The chancellor, upon the conclusion of the hearing, filed an opinion from which the order of August 7th, 1922, resulted. The chancellor held that where stockholders of a corporation deposit their shares with a committee with power in the committee to reorganize the company and purchase its assets at any sale for the stockholders' account and benefit, with provision that if the stockholders dissent from any such action, they shall express their objection within a certain time or be deemed to consent, nevertheless, as the power is not coupled with an interest it is subject to modification or revocation, and depositing stockholders may dissent from the action of the committee by giving actual notice thereof, irrespective of the terms therefor prescribed in the agreement between the stockholders and the committee. The effect of this decision was to nullify the provisions of the contract made between the depositing stockholders, the committee and the depositary. The chancellor did not find the committee guilty of fraud and misconduct. In fact none was proven. The question raised upon this appeal is whether stockholders who voluntarily enter into an agreement among

themselves for their protection by depositing their shares of stock with a depositary, divesting themselves of the title to the stock deposited, appointing a committee to act for them, placing the title of the stock in the committee to do with it as their judgment dictates, are bound by the provisions of the agreement, or whether they can at will revoke or modify the same. If the views of the learned chancellor are correct, stockholders' protective agreements are but a rope of sand. The one entered into in this case is in the usual form and contains the provision for vesting absolute power over the stock deposited in the committee customarily found in such agreements. The agreement could not be couched in stronger language or contain broader powers to effectuate its purposes. If this agreement did not empower the committee to make a binding contract with Mr. McNeal which would include the use of the stock deposited with it and to which it had the legal title, without further specific authorization from the committee, then no agreement could be drawn which would give a committee the powers necessary to make a binding contract containing provisions for the use of the stock deposited under the agreement.

If the view entertained by the court below is sound, the work done by this committee has been futile. We have seen how the committee was able to frustrate sales of the property at times when there would probably have been no salvage for the stockholders. By its action and through the very agreements complained of it was enabled to sell the property at such a sum as to insure to the depositing stockholders securities of value in the new company and to the non-depositing stockholders cash for their distributive shares of the purchase price. The immediate effect of the order appealed from is to make it impossible for the committee to perform the contract with Mr. McNeal. The contract provides as follows:

"*Seventh.* Upon the stock credit provided in paragraph 'eight,' or its equivalent, being allowed for the purpose of making settlement with the receiver for the property, McNeal agrees to then furnish the

committee with such further moneys as it may require to make, perform, carry out and complete any bid for the aforementioned property made by it as herein provided.

"*Eighth.* The committee shall, in the event the aforesaid property be acquired by it, tender to the receiver of the Newlin Haines Co. [in part payment of its bid] all shares of stock of said company now held or controlled by said committee, and request that the share of the proceeds of sale accruing to the committee by virtue of its ownership or control of said stock, be credited thereon, in lieu of any cash distribution, and that said amount be offset against that much of the purchase price. Said committee shall make all reasonable effort to acquire compliance with said request, but assumes no obligation in the event of refusal to allow the same. The committee agrees that any further emoluments or distributive shares arising by virtue of the said purchase or thereafter to be received from the said receiver [arising from whatever course] distributed to the shares held or controlled by the committee shall forthwith upon being so received be delivered up to the said St. Charles Hotel Company."

By these provisions the committee must apply the distributive shares of the stock they hold on account of the purchase price of the property before it becomes obligatory upon Mr. McNeal to provide the cash necessary to carry out other provisions of the agreement. The effect of the order appealed from, which gives an election to the depositing stockholders to withdraw their stock, is to make it impossible for the committee to carry out their covenants because they cannot apply the distributive shares they thought they controlled at the time of the making of the agreement to the payment of the purchase price of the property as provided in the agreement with Mr. McNeal. This would release Mr. McNeal from his obligations. The committee would be unable then to pay for the property. There would be no alternative but to resell the property, and without that concert of action obtainable through the committee holding some ninety per cent. of the outstanding stock, it is doubtful if the property would sell as advantageously at a re-sale.

The learned chancellor supports his views of the agreements in question by holding that although the legal ownership of the stock was placed in the committee by the original agreement that the stockholders, nevertheless, are the beneficial owners of the stock and the committee are the fiduciaries; that the

relationship of trustee and *cestui que trust* obtains; that the vesting of the legal ownership of the stock in the committee in terms, added nothing to the interest which they already had; that the powers of the committee (trustees) are not coupled with an interest, and therefore may be modified or revoked by the *cestui que trust;* that the provisions of the agreement cannot operate to deprive a depositor from dissenting from any plan that the committee may propose; that no consideration passed from the committee to the stockholders whereby they are bound hand and foot and rendered unable to act for themselves by reason of the terms of this seemingly iron-bound contract. From these views we dissent. In the first place, the mutual covenants made between the depositing stockholders and each other, and the committee and the depositary, set forth in the original and supplemental agreements, constitute a good and valuable consideration. In the second place, we are of the opinion that the powers conferred by the depositing stockholders on the committee are not within the class of naked powers uncoupled with an interest and revocable, mentioned by the chancellor, but that the powers conferred upon the committee are real powers coupled with an interest. The stockholders parted with their title to their property. They directed that the depositary was to use the stock as directed by the committee in their discretion. The committee acted upon the authority given to them by the agreement. They made the contract with Mr. McNeal. On the faith of this contract Mr. McNeal, among other things, furnished the committee with $35,000 to enable them to bid at the sale. After giving to the committee powers which they in good faith exercised, the stockholders cannot withdraw their shares of stock deposited by them and rid themselves of the obligations they assumed, or authorized their agents, the committee, to assume, by becoming parties to the protective agreement.

To permit this would be to permit principals to repudiate the acts of their agents. The committee has an interest in the shares of stock owned and controlled by them to protect them-

selves, for example, for their liability to Mr. McNeal for the $35,000 borrowed from him for the purpose of the sale and now in the hands of the receiver to be applied to the purchase price of the property. It would be inequitable to permit depositing stockholders to withdraw their stock after a committee, relying upon deposits of stock and in pursuance of the powers conferred by an agreement, had entered into binding contracts with third parties.

Where a committee has acted within the powers conferred upon them by an agreement the donors of those powers (in this case the stockholders) cannot nullify the obligation of a contract entered into by the committee under the express powers given to the committee by the donors.

To support his views that the powers of the committee are not coupled with an interest and therefore may be modified or revoked the chancellor cites two New Jersey cases.

The first case cited by the chancellor is *Den* v. *McCann, 3 N. J. Law 31.* This was an action in ejectment. There was a devise to executors to sell. Two of the executors died and the surviving executor sold to a stranger who almost immediately conveyed the property back to the executor. The case dealt with the difference between a devise "that executors shall sell land" and the devise "of land to executors to sell." In one case the court said: "The descent is broke. The land vests in the executor as joint tenants and goes to the survivor who can legally convey. In the other case the descent is not disturbed but the fee remains in the heirs-at-law until the executors sell. They then have only a naked authority which cannot survive. The first is in fact an authority coupled with a legal title; the second a bare, naked authority. That the executors have an interest in their office by way of an allowance or compensation for their services does not in my mind affect this case.

"When the books speak of the authority, coupled with an interest, an interest by way of benefit or emolument for transacting business is not intended; but an actual interest or right in the thing to be conveyed."

This case does not consider the question of repudiation by the donor of acts done in pursuance of a power of attorney prior to the revocation which is the question at issue in the present case, and therefore does not in our opinion support the opinion of the chancellor.

The other case cited by the chancellor is the case of *Durbrow* v. *Eppens, 65 N. J. Law 10.* This was a case where a syndicate was formed to issue policies of insurance. Several parties contributed ratably to a fund, executed a deed of trust creating the same party the agent for each, and covenanted to maintain the fund, notwithstanding withdrawals by losses, and empowered the agent to handle the trust and pay losses out of it. One of the underwriters died and his executor claimed that the power conferred by the deed of trust upon the agent terminated with his testator's death. The supreme court held that the power survived the death of the donor, and that each of the donees, together with the survivor in interest of any deceased donee, were bound by the several deeds of trust made to carry out a common purpose. While the opinion of the supreme court rendered by Mr. Chief-Justice Depue refers to the established rule of common law that the death of the principal puts an end to the agency where the authority is not coupled with an interest and no act of agency subsequent thereto is binding upon the estate of the principal, yet in the case under consideration he held that the power was coupled with an interest. This case, we think, supports the view of this court to the effect that the powers given to the committee under the protective agreement were really powers coupled with an interest.

The effect of the decision below is to make an agreement for the parties different from the one they made for themselves. This the court of chancery cannot do. Contractual rights cannot be disturbed. Mr. Justice Brewer, in the case of *Merchants Loan and Trust Co.* v. *Chicago Railway Co., 158 Fed. Rep. 923,* said, in speaking of a complicated street railway problem in Chicago, "that the ordinance tendered by the city was reasonable and fair, and that as a business proposition it would have been wise for all parties to accept it;

but the court does not make contracts for parties. It deals with legal rights, as the parties have, by contract, made them, and although it may believe that a party insisting upon those rights is probably, or even certainly, bound to suffer loss, yet while he insists it must protect him in his insistence. There is no wide discretion vested in the chancellor which permits him to disturb contract rights—rights of property." * * *
"Of course, there can be no question about this. It appears from the discussion that this whole scheme is predicated upon the fact that the physical condition of the city railway system on the north and west sides is poor; that it needs improvement; that the interests there are conflicting; that franchises are expiring or have expired; rights are mingled and perhaps confused; separate liens and separate corporate interests shall be merged in one corporation, whose duty it shall be to borrow money enough to put the physical property in good condition. Now, that may be a wise business proposition, and if the court had power to take hold of these things and do for the people, who are the mortgage bondholders, that which it thinks best for them, we might have no hesitation in sustaining this; but every man in this country decides questions in respect to his own property for himself. Life, liberty, and the pursuit of happiness are guaranteed to each one. They are inalienable rights, and although a man misjudges what is best for him, that fact gives no court the right to compel him to act otherwise."

Where a committee has acted within the powers conferred upon them and in good faith, the depositing stockholders cannot withdraw their stock from the control of the committee unless the agreement so provides. The agreement establishes the rights of the parties and a court cannot read into it any other or additional terms * * * or make a new contract for the parties. *Fletch. Corp.* ¶ 4841.

Did the protective agreement authorize the acts complained of, especially the use of the stock, to apply upon the purchase price of the property, if bought by the committee? The agreement provides as follows:

"(*d*) By the seventh section the committee is, *inter alia*, authorized to appear in legal proceedings, particularly 'to bid or refrain from bidding for all or any portion of the property of the company at any judicial or other sale; to purchase any or all of such property for the account of depositors at any price which committee may in its discretion deem advisable; to apply the said stock or any portion thereof or the dividends payable thereon out of the purchase price of any such property in satisfaction of any bid or toward the payment of the purchase price of any property purchased, to distribute *pro rata* among depositors any or all property coming into its hands at any time for the security of said depositing stockholders; or to resell the same in whole or in part for such price, whether in cash or securities, or partly in cash or partly in securities and upon such terms as to payments or otherwise as committee in its discretion may deem advisable.' 'To take any action or proceedings which committee in its discretion may deem advisable for perfecting the title, ownership and possession of company's property or any part of it or for the purpose of expediting any reorganization or avoiding litigation.'

"(*e*) By paragraph 8, in the event of acquiring the property, 'committee may sell it in whole or in part for such price whether in cash or securities or partly in cash or partly in securities and upon such terms as to payment and otherwise as company deems advisable. Committee may in such event cause a new corporation for stock or cash or partly in one and partly in the other as committee deems for the best interest of depositors, the whole or any part of the property which committee may acquire * . * * committee shall also have the power to cause such new corporation to incur a debt sufficient to pay and liquidate any sums of money which committee deems it advisable to raise,' whether for expenses for the purpose of the new corporation or for carrying out the terms and provisions of 'any plan or agreement or reorganization of the company.'"

In their agreement with Mr. McNeal the committee did nothing more in this respect than to exercise the powers expressly conferred by the paragraphs above quoted.

While the chancellor found the committee guilty of no fraud or misconduct, in his opinion he stated, "But, assuming for the sake of argument, that the tripartite agreement is strictly enforceable according to its liberal terms, nevertheless, when a plan or reorganization is entered into in which (instead of giving all of the property and things of value which are to be acquired under it, to the stockholders, less, of course, reasonable expenses, as required therein) a provision is made, as here, for the giving of at least eighty-five per cent. of an

entire issue of ten thousand shares of no par common stock to the promotor of the reorganization by way of compensation, the plan is not one comprehended by the terms of the agreement, and the depositors, therefore, have a right to signify their dissent by actual notice to the committee, quite irrespective of the particular kind of notice prescribed by the terms of that agreement. The interest represented by this non par stock is of course exactly the same as it would be if it had par value; and par value would not restrict its owner to the amount of interest written upon its face, for, if the enterprise were a success, the stock would be appreciated and might become worth much more than its par value."

This statement, we feel, needs a few words of comment. The common stock of the Newlin Haines Company, at the time of the formation of the committee, was worthless. The preferred stock came ahead of it and that also at the time was worthless. The work of the committee and changed business conditions made the St. Charles property more valuable. This gave to the preferred stock of the Newlin Haines Company value. The enhancement in value was insufficient to make the common stock of any value. The mortgages, receivers' certificates, and expenses amount to approximately $1,100,000. The property sold for $1,463,000. The salvage goes to the preferred stockholders of the Newlin Haines Company, who receive, under the plan of reorganization for each share of the preferred stock of that company, one share of the preferred stock of the new company. The common stockholders of the Newlin Haines Company will receive fifteen per cent. of their former holdings. The stock which goes to Mr. McNeal has no value. It only becomes valuable if he makes it so. The committee are acting entirely within their powers in issuing to him this stock. No one would advance to the committee the funds necessary for their plan of reorganization on more favorable terms than Mr. McNeal. There is no impropriety, as we see it, in the committee making the contract it did with Mr. McNeal with reference to the common stock of the new company.

As to the status of the objectors. Mr. Godfrey bought a certificate for one share of preferred stock issued by the depositary. The protective agreement provides as follows:

"Each stockholder depositing his stock as aforesaid shall be entitled to a certificate of deposit in such form as may be determined by committee * * *. By receiving a certificate of deposit issued by depositary, any recipient or holder thereof shall thereby become and be a party to this agreement and be bound by its provisions with the same force and effect as though an actual subscriber thereto."

Mr. Godfrey's rights could rise no higher under any circumstances than those of his transferor. Mr. Godfrey's predecessor in title, by the deposit of the one share of preferred stock for which the certificate of deposit was issued, had become bound by the provisions of the protective agreement. Mr. Godfrey, when he purchased the certificate, likewise became bound by the provisions of the agreement which we have held prevented the action desired by Mr. Godfrey's petition. This makes it unnecessary to consider the status of one who purchases a standing or license, as it were, to institute litigation.

Mr. Clendenin in his lifetime became a party to the protective agreement. In express terms the agreement bound the representatives of depositors. Mr. Adams, as the administrator of the Clendenin estate, stood in the shoes of his intestate. The agreement bound Mr. Clendenin. It binds Mr. Clendenin's representative, Mr. Adams. On the question of the amendment of the basic agreement, it perhaps should be said that Mr. Adams admitted receiving the notices regarding the amendment of October 20th, 1921. He did nothing. He made no claim that the agreement of October 14th, 1918, could not be amended in the manner in which it was until May, 1922. This was after Mr. McNeal had entered into his agreement with the committee. Under these circumstances laches would also be a bar to the relief which Mr. Adams seeks in his bill of complaint.

For the foregoing reasons the order of the court of chancery dated August 7th, 1922, is reversed *in toto* to the end that both the petition of Mr. Godfrey and the bill of Mr. Adams be dismissed, with costs.

No. 38—

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, KALISCH, BLACK, KATZENBACH, WHITE, GARDNER, ACKERSON, VAN BUSKIRK—12.

No. 41—

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, KALISCH, BLACK, KATZENBACH, WHITE, GARDNER, ACKERSON, VAN BUSKIRK—12.