192 N.J. Super. 60 (1983)
469 A.2d 74
GEORGE HUGHES, PLAINTIFF-RESPONDENT,
v.
SEGO INTERNATIONAL LTD., SEGO INTERNATIONAL, INC., GERALD D. KNIFFEN, RAYMOND L. PIERCE & WILLIAM F. HAAG, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 31, 1983.
Decided November 21, 1983.
*62 Before Judges MORTON I. GREENBERG and TRAUTWEIN.
Thomas DiBiasi argued the cause for appellants (Citrino, Balsam, DiBiasi & Daunno, attorneys; Barney Katchen on the brief).
James LePore argued the cause for respondent (Breslin, Herten & LePore, attorneys; James LePore and Andrew J. Cevasco on the brief).
The opinion of the court was delivered by MORTON I. GREENBERG, J.A.D.
*63 This matter comes on before the court on appeal from the Superior Court, Chancery Division, Hudson County, in an action in which the court fixed the purchase price for plaintiff's shares in Sego International, Ltd. and Sego International, Inc. (together referred to as Sego) pursuant to N.J.S.A. 14A:12-7(8). An understanding of the issues requires that we set forth the facts as developed at the trial and the procedural history of the case at length.
In 1974 plaintiff, George V. Hughes, defendants, Raymond L. Pierce and William P. Haag III, and Ronald Molinaro formed Sego. Each made a $5,000 capital contribution for a 25% stock interest and they became the only shareholders, officers and directors of Sego. In late 1974 Sego began offering management consulting services to industry. The business had three aspects: (1) sales, meaning soliciting business; (2) analyses, meaning the onsite study and evaluation of a business operation followed by the submission of a report, and (3) initiation of projects to implement recommendations of the analyses.
In 1975 Molinaro terminated his relationship with Sego without any request for payment for his percentage of ownership. At that time the three remaining stockholders therefore owned one-third each of Sego. In May 1978 Gerald D. Kniffen purchased a 25% interest in Sego for $77,312.50.
On June 21, 1978 the four stockholders entered into a buy-sell agreement for the expressed purpose "to provide for the continuous and financially sound operation of the Corporations notwithstanding the death(s) of any of the Partners" and to provide "a method and mechanism which will assure the continuous and financially sound operation of the Corporations in the event of death(s) of any of the Partners."[1]
The agreement included the following provisions:
*64 (1) Sego shall insure the life of each partner with Sego as beneficiary.
(2) Upon the death of a partner, Sego shall purchase the deceased partner's stock in the corporations.
(3) The total value of all the shares in Sego, if any were to be purchased under the agreement, was to "be the average yearly gross revenues of the Corporations over the five (5) full fiscal years immediately preceding the death of the Partner multiplied by two and one-half (2 1/2)." The value paid by the purchaser for the shares of the deceased partner was to be determined on a percentage basis so that for a 25% share he would receive 25% of the total value.
(4) Sego and then the partners shall have the right of first refusal at the same price that a deceased partner's shares would be valued if a partner wished to sell his stock during his lifetime.
The record indicates that each stockholder performed a particular function for Sego. Plaintiff supervised sales; Pierce was assigned to overall administrative leadership and operations; Haag supervised analysis functions and Kniffen handled analyses and projects. Some disputes developed among the stockholders. Apparently the other stockholders thought that plaintiff had not produced adequate sales. Thus on December 20, 1978 at a regularly scheduled meeting of the board of directors, Pierce, Haag and Kniffen voted to terminate plaintiff's employment.
On June 25, 1979 plaintiff filed a complaint against Sego and the other three shareholders seeking, inter alia, dissolution of Sego on the basis of unfair and oppressive treatment towards a minority shareholder.[2] The matter was tried before a Chancery Division judge who, on September 23, 1980, decided the case in an oral opinion from the bench.
*65 The judge stated "... that the reason for Hughes' termination was ... that the individual defendants were dissatisfied with the result of his sales efforts." Although he determined that plaintiff's termination was a good faith business judgment, "... their dissatisfaction with Hughes was not the result of any failure on his part to perform his duties creditably and conscientiously." Thus, plaintiff's lack of effectiveness was not due to misconduct. Accordingly, the judge concluded "... that the termination of Hughes' employment under these circumstances constitutes oppressive conduct ..." under N.J.S.A. 14A:12-7(1)(c), as the defendants had acted "... contrary to the understanding of the parties...."
The judge determined that the only prescribed and authorized relief was a dissolution of the corporation. He indicated, however, that the judgment would not preclude defendants from purchasing plaintiff's stock pursuant to law. Obviously in response to this decision defendants moved to purchase plaintiff's stock pursuant to N.J.S.A. 14A:12-7(8). On January 22, 1981 the judge granted defendants' motion. Inasmuch as the parties did not agree on the stock's value, the judge appointed American Appraisal Company (hereinafter called American) to appraise the stock.
American made its appraisal using the capitalization of income approach for two dates: December 31, 1978  the approximate date plaintiff was fired and October 15, 1980  the date of the judgment for dissolution. It submitted to a new judge, who had taken the first judge's place, an "Investigation and Appraisal Report of Sego" wherein it assigned values of $8,300 for the former date and $50,900 for the latter date.
Plaintiff objected to the figures derived by American arguing that although capitalization of earnings appears to be the best approach in valuing Sego, this method should be "... controlling only where there exists no better basis for determining the value of the intangible assets of a business." Plaintiff maintained that the parties' own buy-sell agreement was a better *66 method to set value and should control. Defendants countered that the buy-sell agreement was not intended to apply to this situation and that the appraiser's report accurately valued plaintiff's shares.
The judge in considering the value of the stock, adopted the earlier date since the subsequent increase in value of Sego could not be attributed to plaintiff's efforts.[3] Following plaintiff's reasoning, he decided that it would not be inequitable to apply the terms of the buy-sell agreement to value plaintiff's stock. He pointed out that when Kniffen had purchased his stock before the buy-sell agreement was executed, the parties must have considered it was worth at least $77,000. Accordingly, in an order dated June 30, 1982, he adopted the formula set out in the agreement to value the stock and requested that American make the computations. American rendered its report on August 9, 1982 and on September 23, 1982 the judge issued an order for judgment for $157,875 against all five defendants. This sum was recited in the judgment to be the fair value of plaintiff's shares in Sego. On November 5, 1982 defendants filed a notice of appeal from this order for judgment.
On January 28, 1983 plaintiff moved to garnish the wages of defendants Kniffen, Haag and Pierce to satisfy this judgment. This motion was withdrawn pursuant to a consent order wherein Kniffen and Haag agreed to pay $150 per week to plaintiff until the judgment was fully satisfied. Kniffen and Haag, however, did not pay any money to plaintiff. Accordingly, plaintiff filed a motion returnable April 8, 1983 to enforce litigant's rights seeking unpaid arrearages. When plaintiff filed his brief on this appeal the motion was still pending in Superior Court, Chancery Division, Hudson County.
Defendants assert that the judge erred in adopting the formula contained in the parties' buy-sell agreement to value the stock. Defendants argue that both the terms and the intent *67 underlying the agreement indicate that the parties did not intend it to apply in a situation in which a court determined fair value pursuant to N.J.S.A. 14A:12-7(8). Rather, defendants argue that the agreement establishing the value of Sego's stock applies: (1) upon the death of a partner when the corporation purchases the deceased partner's shares, or (2) to set a first refusal price if a partner wished to sell his stock during his lifetime. Defendants urge that since the buy-sell agreement does not govern, American's appraisal report should have been adopted by the court as establishing the fair value of the stock. Defendants argue that American considered all relevant data in preparing the appraisal and thus the appraisal accurately depicted the value of the stock.
Plaintiff asserts that because of Kniffen's and Haag's failure to pay the $150 per week their appeal should be dismissed. On the merits he counters that deference must be granted to the discretion of the court in determining the fair value of the stock. Plaintiff claims that the buy-sell agreement is the most appropriate method for determining the fair value of the stock. Plaintiff states in his appellate brief: "... where there is an agreement between a stockholder and the corporation to buy the stock of a closed corporation, it raises a presumption that the amount agreed upon constitutes the market value, which presumption can only be overcome by showing that the agreement was not at arms-length or would result in a windfall." Plaintiff concludes that the unique nature of Sego's business mandates rejection of the income capitalization-valuation approach and militates in favor of adopting the agreement as the proper valuation method.
N.J.S.A. 14A:12-7(1) provides that if corporation "... directors or those in control ... have acted oppressively or unfairly toward one or more minority shareholders in their capacities as shareholders, directors, officers, or employees," the Superior Court may "... enter a judgment dissolving the corporation...."
*68 The court made such a finding and ordered dissolution in an order not challenged on appeal. Defendants subsequently moved to purchase the minority shareholder's interest pursuant to N.J.S.A. 14A:12-7(8). This section provides in part:
Upon motion of the corporation or a holder or holders of 50 percent or more of the outstanding voting shares of the corporation, before or after the appointment of a custodian or provisional director, the court may order the sale by the plaintiff or plaintiffs of all shares of the corporation's stock held by them to either the corporation or the moving shareholders, whichever is specified in the motion, if the court determines in its discretion that such an order would be fair and equitable to all parties under all of the circumstances of the case.
(a) The purchase price of any shares so sold shall be their fair value as of the date of the commencement of the action or such earlier or later date deemed equitable by the court, plus or minus any adjustments deemed equitable by the court if the action was brought in whole or in part under paragraph 14A:12-7(1)(c).
Inasmuch as this motion was granted and the parties did not agree on value it became incumbent upon the trial court to determine the "fair value" of the stock. Although the parties' dispute centers around the method for determining fair value and the resulting figure, we conclude that notwithstanding the form of the judgment the judge never made this statutorily mandated inquiry. The judge in his opinion, making reference to the great difference between the value of plaintiff's shares when valued under the American report and the stockholders' agreement, stated: "faced with these widely disparate figures I must determine under N.J.S.A. 14A:12-8(a) [sic] an equitable purchase price for plaintiff's shares." The judge rejected American's appraisal. Instead he decided that "... it does not seem inequitable to enforce the terms of the parties own agreement." But he neither determined the "fair value" of the stock nor found that the agreement established the fair value of the stock. He considered that the price paid by Kniffen which far exceeded that produced by American's appraisal bolstered his opinion.
We do not doubt that the judge could make adjustments to the fair value to reflect the equities of the case and in so doing could appropriately consider the shareholders' agreement. See N.J.S.A. 14A:12-7(8)(a). But this power could be exercised *69 only after the court or parties determined the fair value of the shares. While the judge thought that the price paid by Kniffen in May 1978 established fair value as of that date he did not use that figure to establish fair value as of December 31, 1978. Rather, he used the Kniffen purchase to support his conclusion that it was equitable to value plaintiff's shares in accordance with the agreement.[4] Inasmuch as the judge did not make the initial finding of fair value his order must be reversed.
In reaching our result we have not lost sight of the fact that shareholder agreements are normally enforceable. See, e.g., Fountain v. Fountain, 9 N.J. 558 (1952); Unger v. Newlin Haines Co., 94 N.J. Eq. 458 (E. & A. 1923). This rule of law, however, does not help plaintiff since the agreement by its very terms does not apply. The agreement expressly provides that the formula contained therein shall be used to determine the value of stock if: (1) the corporation purchases a stockholder's stock after his death or (2) if a stockholder desires to dispose of his stock during his lifetime and the corporation desires to exercise a right of first refusal. The parties, therefore, expressly provided the instances in which the valuation formula contained in the agreement would apply. Since the courts will not rewrite the contracts of litigants, Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 183 (1981); Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960), the terms of the agreement are not binding in a situation beyond the contemplation of the parties. If the parties intended the agreement to apply so as to *70 fix a price set under N.J.S.A. 14A:12-7(8)(a), they could have said so.
We make one final observation with respect to the agreement. It was written primarily for application upon the death of a stockholder. Obviously it was contemplated that the funds for the purchase be derived from life insurance. The formula used to establish the price is based solely on gross revenues. Accordingly the shares under the agreement could be highly valued even though the corporation might have no assets or might be losing money. Further the formula takes into account the gross revenues over five years. Thus under the formula it does not matter whether the trend of business is up or down. We note, too, that if the right of first refusal is activated by a stockholder desiring to sell his shares, the option to exercise the right is that of the purchasers. Presumably they would then assess the value of the shares in determining whether to acquire them. These considerations lead us to believe that the price established by the formula might radically depart from a fair value.
Defendants urge that we direct that the American report be adopted as establishing fair value. We reject this approach. The trial court in the first instance should determine fair value. It may adopt the American report to determine fair value or it may ascertain fair value in another way. If, in its judgment, the situation so warrants, the court may make the equitable adjustments authorized by N.J.S.A. 14A:12-7(8)(a).
Finally we consider plaintiff's contention that we should dismiss Kniffen's and Haag's appeal because of their failure to pay the $150 per week. We are reluctant to do this in a case in which the alleged contempt is a failure to pay money, see Hallberg v. Hallberg, 113 N.J. Super. 205 (App.Div. 1971), particularly in the absence of a showing of the circumstances underlying their failure to make payments. The record does not unequivocally show that their failure was intentional. Further, even if we did dismiss their appeal we would adjudicate the appeal of Sego and Pierce on the merits. In our view it would *71 be anomalous to let a judgment, found to be erroneous, stand against two defendants on the grounds that they failed to comply with an order requiring its partial satisfaction. We find this an appropriate case not to dismiss the appeal notwithstanding the alleged contempt. See Raybin v. Raybin, 179 N.J. Super. 121, 126 (App.Div. 1981).
This matter is remanded to the Superior Court, Chancery Division, Hudson County, for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.
NOTES
[1] The agreement used the term partners notwithstanding the corporate form. We use the terms "shareholders" or "stockholders."
[2] The complaint contained a number of counts praying for different relief. For purposes of this appeal, however, dissolution of the corporations and the subsequent valuation of the stock are the only relevant matters.
[3] This part of the judge's decision has not been challenged on appeal.
[4] Even if N.J.S.A. 14A:12-7(8) provided for the purchaser to pay an "equitable" price, we would have serious doubts as to the relevancy of the Kniffen purchase price. His purchase agreement set forth that the $77,312.50 represented 25% of the anticipated net profits of contracts he was to produce for Sego. If his share of these profits was less than $77,312.50 the purchase price could be reduced. Apparently the parties contemplated he would get back what he paid. On the other hand the buy-sell agreement is dependent solely on past revenues. The formula takes into account neither future business nor net profits.