776 A.2d 915 (2001)
342 N.J. Super. 419
Danilo TORRES, Plaintiff/Respondent/Cross-Appellant,
v.
SCHRIPPS, INC. and Dan Marcus, Defendants/Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 2, 2001.
Decided July 9, 2001.
*917 Gene N. Schiffman, Hackensack, argued the cause for appellant/cross respondents (Schiffman, Berger, Abraham, Kaufman & Ritter, attorneys; Mr. Schiffman, on the brief).
Lawrence Minasian argued the cause for respondent/cross appellant (Sluka & Minasian, attorneys; Mr. Minasian, on the brief).
Before Judges WALLACE, Jr., LINTNER and PARRILLO.
*916 The opinion of the court was delivered by WALLACE, Jr., J.A.D.
Defendants, Schripps, Inc. and Dan Marcus, appeal from a judgment of the Law Division determining the value and date of valuation of the shares of stock of Schripps, a closely held corporation. On appeal, defendants contend (1) in several arguments that the trial judge erred in rejecting his expert witness's opinion on the value of the corporation; and (2) the valuation date should be September 29, 1997 rather than February 28, 1997. In his cross appeal, plaintiff Danilo Torres contends it was error not to award him attorneys fees and prejudgment interest. We reverse the determination of the value of the corporation and, in all other respects, we affirm.
Schripps was incorporated in March 1985. The corporation was formed for the purpose of operating a wholesale gourmet bakery business to sell bread, rolls, and specialty bakery items to restaurants. Defendant [1] supplied the initial capital to operate the business. He was in Germany while plaintiff handled the day-to-day operations of the business in New Jersey. Defendant initially owned all of the shares of stock issued by Schripps. Plaintiff subsequently acquired a twenty-five percent interest in the corporation through corporate stock sales and the issuing of stock by Schripps. Defendant eventually moved to the United States and thereafter dealt with the bookkeeping and management of the company, while plaintiff continued to operate the business.
In October 1994, plaintiff and defendant entered into a Cross Purchase Agreement (Agreement). The Agreement related to the disposition of each of the parties' interest in the stock whether disposed of during life or upon either parties' death. The Agreement permitted plaintiff to purchase *918 one share of stock per year for the price of $10,000.00 per share. However, the stock was valued in the agreement at $12,000 per share or a total value of $1,200,000. This value was later increased to $15,000 per share or a total value of $1,500,000. The Agreement provided that upon the death of either party, the living party shall purchase the decedent's stock for the value in the Certificate of Value partially using the proceeds from life insurance held by the partners. In addition, the Agreement provided:
In the event Torres desires to cease to be employed by the Corporation or in the event he shall cease being employed by the Corporation for any reason other than his death or disability, Marcus shall have a first option to purchase Torres' interest in the Corporation at a price mutually agreed upon. If Marcus refuses Torres' offer to sell his Stock, then Torres shall be free to sell his Stock to a third party.
From the time of its inception, Schripps had grown and had become marginally profitable by 1996. Plaintiff believed he was entitled to more money from the corporation. In January 1997, he wrote to defendant requesting that Schripps be restructured. Plaintiff set forth the following options to accomplish his desire for a greater share of the corporation: (1) an increase in his salary to at least $10,000 monthly and a decrease in defendant's salary, but with defendant taking profits as a shareholder; (2) continuing the current salary structure of $4500 monthly to each partner, with a 50-50 split of the profits, but also with the ownership interests remaining the same for the purposes of sale or death of one of the parties; (3) an increase in his stock by 15%, giving him a 40% interest in the company in recognition of his past service to the company; (4) sell Schripps and dissolve the partnership; or (5) defendant could buy him out but retain plaintiff as General Manager and pay him in accord with the benefits and salary of a person in that position.
Defendant was upset by plaintiff's letter. He felt plaintiff was attempting to steal his business. After speaking with plaintiff on the phone and at Schripps the next day, defendant approached plaintiff about leaving the business. Both parties agreed that it would be best for defendant to buy plaintiff's interest and for plaintiff to leave as an employee of the corporation.
From February 4, 1997 until February 28, 1997, plaintiff and defendant attempted to reach an agreement regarding the buyout. They each hired counsel. Defendant wanted plaintiff to temporarily remain employed in a consulting role, teaching defendant how to operate the business. Defendant also wanted plaintiff to sign a non compete agreement. After considering the proposal, plaintiff informed defendant he was uncomfortable signing the non compete, and eventually refused to sign the agreement. The parties made offers and counter-offers to purchase each others' shares but without success.
On February 28, 1997, after the negotiations broke down, defendant wrote plaintiff a letter terminating his employment with Schripps effective April 15, 1997. Defendant suggested an independent appraisal of the corporation to determine the price he would pay for plaintiff's shares.
Defendant then obtained an appraisal, which listed the net equity of the corporation at $98,764, with liabilities totaling $364,756 and assets totaling $463,520.00. Plaintiff believed the appraisal undervalued the assets of the corporation and wholly excluded other assets. Defendant then offered to buy plaintiff's 25% interest in the company in accord with the $98,764.00 appraised value. Plaintiff stated that if the corporation was only worth $98,000 *919 then he would buy defendant's interest and thus own the company outright. Plaintiff then offered to purchase the corporation for $200,000. Defendant in turn matched this offer and plaintiff counter-offered at $300,000. The parties still could not reach an agreement.
In April 1997, plaintiff formed Alpine Bakery, Inc., a wholesale specialty bakery business. The master baker for Schripps, Gerard Von Gerichten, left Schripps and started working for Alpine Bakery in July 1997. Defendant claimed the loss of Von Gerichten was crippling to the corporation.
Following plaintiff's departure, Schripps began to lose money. Defendant asserted that Schripps' gross sales decreased by $748,000 for the first nine months of 1997, and the corporation lost $125,215 for that period.
Plaintiff testified that Alpine Bakery began to actively solicit customers in August 1997, and its first sale was September 5, 1997. Plaintiff admitted that several other Schripps' employees, apart from the master baker, came to work for him in August and September 1997 and by October he was serving two of Schripps' former customers.
In August 1997, the Board of Directors of Schripps adopted a resolution to dissolve the corporation. On September 8, 1997, a Special Meeting of the shareholders was held. As majority shareholder, defendant voted to dissolve the corporation and distribute the assets of the corporation in accordance with a Plan for Liquidation. Plaintiff objected to the dissolution. On September 12, 1997, plaintiff offered to purchase Schripps for $200,000 and assume payments of Schripps' liabilities, subject to conditions.
On September 29, 1997, European Bread, Inc., a corporation solely owned by defendant, purchased the assets of Schripps for $200,000 and assumed liabilities of approximately $364,756. Defendant thereafter claimed that plaintiff was owed $50,000 for his 25% ownership share of Schripps stocks. Schripps no longer operated any business after September 29, 1997, but European Bread registered the trade name of Schripps and operated the business.
On November 18, 1997, European Bread, trading as Schripps, submitted a loan application to Summit Bank. Defendant's financial statement was attached to the application and listed Schripps as an asset valued at $850,000. The financial statement was dated September 18, 1997, eleven days prior to the sale of Schripps.
On December 4, 1997, plaintiff filed a complaint against defendant and Schripps. Plaintiff alleged defendant improperly depleted the profits and cash reserves of Schripps, and claimed defendant's acts constituted fraud, illegality, mismanagement, and acts of oppression. Plaintiff sought to have (1) a receiver appointed to manage Schripps until a fair reasonable valuation could be obtained; (2) an inspection of the financial records of Schripps and European Bread; (3) an independent valuation of Schripps; (4) a reversal of the transfer of Schripps assets to European Bread; and (5) the opportunity to purchase Schripps after the market value was obtained. Defendant and Schripps filed an answer denying the allegations.
Prior to the start of trial, defendant sought to exclude testimony of all settlement offers between the parties. He conceded plaintiff was entitled to be paid the value of his minority interest, but the only issue was the value of corporation. Plaintiff sought to admit the settlement offers for the limited purpose to show defendant's bad faith and on the issue of credibility. The judge expressed doubt as to the materiality of the settlement discussions, *920 but deferred ruling on the motion until trial. At trial, the judge ruled that the settlement discussions would not be considered for purposes of valuation of the corporation.
Plaintiff testified to his version of what transpired, but failed to present expert testimony as to the valuation of Schripps. Defendant called Stephen C. Chait, C.P.A., as his expert on the value of Schripps. Chait stated the company was profitable as of December 31, 1996, but from January 1997 to August 31 of 1997, there had been a significant change as Schripps had lost money, which impaired its capital, its retained earnings and the overall health of the company. Chait found that for the year 1997 Schripps lost $114,000 as of September 1997. Chait opined that the company's outlook was questionable at that time.
Chait testified he used the capitalization of net income method in determining the value of the corporation as of February 1997. He explained that this method involved examination of the income stream of the company to determine the appropriate capitalization factor, which in turn translated into value. Chait stated that the formula he used was to "take the net income, [ ] add to it the expected long-term growth, and [ ] divide that by [the] required rate of return, minus long-term growth." After applying that methodology, Chait valued Schripps at $222,400 as of February 28, 1997.
Chait testified he could not use the capitalization method for the September 29, 1997, valuation date because the company was in much worse financial condition at that time, since it had a loss of $114,000 for the first eight months. He opined the only way to value Schripps would be the cost approach.
Chait admitted on cross-examination that he was unable to use a market approach in valuing Schripps because he could not find comparable sales of similar corporations within the industry. Chait also admitted that if defendant and his wife were taking exorbitantly high salaries for minimal work, the valuation could potentially double. Moreover, Chait stated he did not do an independent evaluation of the company's assets or account receivables, as these numbers were supplied to him by defendant. Chait was also questioned about whether he valued the goodwill of the company. He replied he did not compute a separate figure for goodwill, but that goodwill was "contained in the income stream that's being capitalized" for the February 1997 valuation. He also did not compute goodwill in the cost approach he used in valuing the company as of September 28, 1997.
The trial judge rendered a written decision and determined that the proper date of valuation of Schripps was February 28, 1997. The judge reasoned that "[t]he business was different after [plaintiff's termination] and was not in the control of the plaintiff who was the real manager." The judge noted that although plaintiff was willing to train defendant, the arrangement was never negotiated successfully. The judge rejected the testimony of Chait, the only expert to testify. The judge found that Chait's failure to include the financial figures for the last quarter of 1997 was a deficiency in his valuation. Moreover, he found that Chait's valuation of the corporation at $98,764 "was considerably less than what the adversaries were offering to buy each other out." The trial judge also found error in Chait's failure to consider the good will of the corporation in his valuation.
The judge also rejected the approach of using the share value set forth in the Certificate of Valuation in the Cross Purchase Agreement. However, the judge *921 held that defendant's estimate of the value of the corporation he listed on a November loan application was an admission under R. 803(b) and thus corroborated the $15,000 per share valuation in the Certificate of Value. Accordingly, the judge valued the corporation at $1,133,000 and plaintiff's share at $283,333. The trial judge credited plaintiff's testimony that he did not solicit Schripps customers nor entice its employees to leave and found that plaintiff did not violate any fiduciary duty to the corporation.
Finally, the judge denied plaintiff's request for counsel fees since defendant did not act "arbitrarily, vexatiously, or otherwise not in good faith". This appeal followed.

I
Defendant contends the trial judge erred in rejecting the testimony of his expert witness. Specifically, defendant contends that because Chait was the only expert presented during the trial, the trial judge should have accepted his valuation. Moreover, defendant contends the trial judge's basis for rejecting Chait's opinion was erroneous.
In general, expert testimony is needed where the factfinder would not be expected to have sufficient knowledge or experience and would have to speculate without the aid of expert testimony. Kelly v. Berlin, 300 N.J.Super. 256, 268, 692 A.2d 552 (App.Div.1997). A witness must be shown to have certain skills, knowledge or training in a technical area in order to be qualified to give expert testimony. N.J.R.E. 702. Further, expert testimony is generally needed to determine the market value of real property. See Jacobitti v. Jacobitti, 263 N.J.Super. 608, 613-14, 623 A.2d 794 (App.Div.1993), aff'd, 135 N.J. 571, 641 A.2d 535 (1994).
Nevertheless, expert testimony need not be given greater weight than other evidence nor more weight than it would otherwise deserve in light of common sense and experience. In re Yaccarino, 117 N.J. 175, 196, 564 A.2d 1184 (1989). The factfinder may accept some of the expert's testimony and reject the rest. Todd v. Sheridan, 268 N.J.Super. 387, 401, 633 A.2d 1009 (App.Div.1993). That is, a factfinder is not bound to accept the testimony of an expert witness, even if it is unrebutted by any other evidence. Johnson v. American Homestead Mortgage Corp., 306 N.J.Super. 429, 438, 703 A.2d 984 (App.Div.1997).
Moreover, in light of our scope of review of a nonjury case, we may not disturb the findings unless they are "so wholly insupportable as to result in a denial of justice." Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). In this regard, our Supreme Court recently explained in a matter concerning the valuation of a closely held corporation that "[t]he findings of the trial court are critical as the valuation of closely-held corporations is inherently fact-based." Balsamides v. Protameen Chemicals, Inc., 160 N.J. 352, 368, 734 A.2d 721 (1999). Further, the Court noted that "great deference is due a trial court's findings, which `will not be disturbed unless [they are] clearly erroneous or show[ ] an abuse of discretion.'" Ibid. (quoting Madeline Marzano-Lesnevich & Francine Del Vescovo, the Minority Discount, 18 N.J. Fam. Law 338, 39 (1998)).
Applying these principles here, the trial judge was not bound to accept the valuation given by Chait. The judge rejected Chait's valuation because he failed to consider the last few months of 1997, failed to calculate the value of goodwill, and valued the company far below the offers made by the parties to buyout the *922 corporation. While the trial judge may have mischaracterized some of the evidence, it was clearly within his discretion to reject Chait's valuation.
Defendant urges that the trial judge erroneously rejected Chait's testimony because Chait excluded the last quarter of 1997 in his valuation. As noted above, the judge was free to disregard the expert's calculations. Further, Chait testified he had no idea that Schripps had been purchased in September 1997. Thus, his view that as of September 1997, Schripps was on the brink of bankruptcy was questionable. Further, Chait could have projected the potential earnings or losses of Schripps for the period from September to December. That is, if he believed Schripps was going to stay in business beyond September 1997, or not, a projection would have been helpful in ascertaining the true value of the company as of September 1997. Nevertheless, once the trial judge determined the valuation date should be February 28, 1997, the information concerning the last quarter of 1997 was of little help in determining the value of Schripps.
Defendant also argues the trial judge erred in finding that Chait's valuation did not take into consideration the company's goodwill. Defendant contends Chait did in fact consider goodwill when he valued the company.
When questioned on cross-examination regarding goodwill, Chait's answers were generalized.
Q. Where in your report does it set forth the value for the good will of the company?
A. The capitalization of income approach, which is shown on page 18, measures the value of the company?
Q. Is good will specifically valued as a[n] asset or an intangible asset of the property?
A. Good will is an intangible asset. It is not measured on the books and records of the company, generally speaking, on most companies until they're acquired. Good will either exists or its does not exist. It exists particularly when there is earnings. That creates value.
Q. Did you come up with a figure for the good will of the company?
A. No.
Q. But that is recognized as an asset of the company, although it being intangible. Correct?
A. That is correct.
On redirect, Chait testified that goodwill was "contained in the income steam that's being capitalized."
Although Chait did not establish a separate amount for the value of the goodwill of the company, he testified that goodwill was part of the capitalization of income approach. Clearly, Chait did not consider goodwill in his valuation of the company as of September 1997. However, since the trial judge determined that the valuation date should be February 28, 1997, and not September 29, 1997, again, this was not an important factor.
The trial judge improperly attributed testimony to Chait regarding the valuation of the corporation. The trial judge found that Chait valued the corporation in the amount of $98,764. This was error. The two values posited by Chait were $222,400 as of February 28, 1997 and $64,000 as of September 29, 1997. In fact, the $98,764 valuation resulted from a separate independent appraisal which defendant had completed after plaintiff was terminated.
We conclude the trial judge did not abuse his discretion in rejecting the valuation of defendant's expert. As the factfinder, the trial judge was free to disregard Chait's testimony. Southbridge Park, Inc. *923 v. Borough of Fort Lee, 201 N.J.Super. 91, 94, 492 A.2d 1026 (App.Div.1985).

II
Defendant next contends the trial judge failed to determine the fair value of the corporation by competent expert testimony.
Under the terms of the Cross Purchase Agreement, if plaintiff ever left the corporation the value of the shares would be determined by mutual agreement of the parties. As noted above, the Agreement gave defendant the first option to purchase plaintiff's shares at a mutually agreed amount. Obviously, the parties failed to reach a "price mutually agreed upon" during their negotiations.
The valuation reached by the trial judge was based upon an amount listed by defendant in a November 1997 loan application. Attached to the application was defendant's financial statement which listed Schripps as an asset valued at $850,000. The financial statement was dated September 18, 1997, eleven days prior to the sale of Schripps. Defendant testified that the "price [he put on the loan application] ... [was] not the real price, it[ ][was] a made-up price." However, the trial judge disagreed, holding that defendant's valuation of the corporation on the loan application was an admission under R. 803(b) and thus corroborated the $15,000 per share valuation in the Certificate of Value. Accordingly,the judge valued the corporation at $1,133,000.00, valuing defendant's share at $850,000.00 and plaintiff's share at $283,333.00.
N.J.S.A. 14A:12-7 permits an oppressed shareholder to petition the court to effect a buyout or other remedy which would relieve his oppression. N.J.S.A. 14A:12-7 states:
(1) The Superior Court, in an action brought under this section, may appoint a custodian, appoint a provisional director, order a sale of the corporation's stock as provided below, or enter a judgment dissolving the corporation, upon proof that

* * *
(c) In the case of a corporation having 25 or less shareholders, the directors or those in control have acted fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholders in their capacities as shareholders, directors, officers, or employees.
[N.J.S.A. 14A:12-7(1).]
The trial judge expressly found that plaintiff was an oppressed minority shareholder. Beyond that, defendant conceded that the only issue was the true value of Schripps.
Consequently, the crucial issue was the fair value of the corporation. Under N.J.S.A. 14A:12-8(a):
The purchase price of any shares so sold shall be their fair value as of the date of the commencement of the action or such earlier or later date deemed equitable by the court, plus or minus any adjustments deemed equitable by the court if the action was brought in whole or in part under paragraph 14A:12-7(1)(c).
"Fair value" is not defined within the confines of the statute and "[t]here is no inflexible test for determining fair value...." Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 397, 734 A.2d 738 (1999); Balsamides, supra, 160 N.J. at 375, 734 A.2d 721.
Generally, in determining fair value, the judge should consider "`proof of value by any techniques or methods which *924 are generally acceptable in the financial community and otherwise admissible in court.'" Balsamides, supra, 160 N.J. at 375, 734 A.2d 721 (citations omitted). The judge may use any acceptable method to calculate the value, but he must determine that the chosen method yields the fair value of the shares. Hughes v. Sego International Ltd., 192 N.J.Super. 60, 68, 469 A.2d 74 (App.Div.1983); Hamilton, Johnston, & Co., Inc. v. Johnston, 256 N.J.Super. 657, 672, 607 A.2d 1044 (App. Div.), certif. denied, 130 N.J. 595, 617 A.2d 1219 (1992).
Valuing a closely-held corporation is a difficult task. Lavene v. Lavene, 148 N.J.Super. 267, 275, 372 A.2d 629 (App.Div.), certif. denied., 75 N.J. 28, 379 A.2d 259 (1977). "There are [ ] few assets whose valuation imposes as difficult, intricate and sophisticated a task as interests in close corporations." Ibid. The valuation is fact sensitive and "depends upon the experience of the appraiser and the completeness of the information upon which his conclusions are based." Bowen v. Bowen, 96 N.J. 36, 44, 473 A.2d 73 (1984)(quoting Lavene v. Lavene, 162 N.J.Super. 187, 193, 392 A.2d 621 (Ch.Div. 1978) (on remand)). As noted above "findings of the trial court are critical as the valuation of closely-held corporations is inherently fact-based" and thus "not an exact science." Balsamides, supra, 160 N.J. at 368, 734 A.2d 721.
Here, the trial judge properly determined that the value set forth in the Certificate of Value should not be used as the presumptive value of the shares of the corporation. See Hughes, supra, 192 N.J.Super. at 68, 469 A.2d 74. However, the judge's use of Rule 803(b) to find that the value defendant listed for the corporation on a financial statement was an admission by defendant was a mistake. There was no evidence in the record that the $850,000 listed on a loan application bore any relation to the fair value of defendant's shares of the corporation. Accordingly, even if this were an admission, the admitted figure did not equate to the fair value of the shares of the corporation.
Although the trial judge rejected the expert's opinion, he was still required to determine the fair value. Clearly, plaintiff's failure to present expert testimony as to valuation enhanced the problem. As Judge Pressler explained in Lavene, supra, 148 N.J.Super. at 276, 372 A.2d 629:
The parties, of course, have the primary obligation of adducing those proofs which will enable the judge to make sound and rational valuations ... [T]he parties must fully cooperate in the court's difficult valuation task and, where necessary, must secure the assistance of appropriate experts to appraise business interests. Plaintiff here did not obtain expert assistance, and that is at least partially the cause of the problem here.
[Id. at 276, 372 A.2d 629.]
Where the parties fail to present sufficient expert testimony, the trial judge must seek assistance from other sources to aid his decision of fair value.
The judge should not refrain from appointing his own expert as well, where the parties' proofs do not provide him with sufficient foundation and guidance. In this context we would not regard it as inappropriate, where circumstances warranted, for the judge to adapt the mechanism provided by the Corporation Act for the valuation of shareholders' interests by appointing an appraiser to make a nonbinding report to it of value. See N.J.S.A. 14A:11-8.
[Ibid. See also Borodinsky v. Borodinsky, 162 N.J.Super. 437, 444, 393 A.2d 583 (App.Div.1978).] *925 In our view, once the trial judge decided to reject the expert's opinion of value, he should have appointed an expert to make a nonbinding report as to the fair value of the corporation. See N.J.S.A. 14A:11-8. Consequently, we remand to the trial judge to determine the fair value of the corporation as of February 28, 1997. The trial judge should appoint an independent appraiser to report to the court on the fair value of the corporation as of that date.

III
Defendant argues that the proper date for valuation of the corporation should be September 29, 1997 (the date of sale), rather than February 28, 1997 (the date of plaintiff's termination) because plaintiff violated his fiduciary duty to the corporation to act in good faith and not to destroy the business of the corporation. Defendant urges that because plaintiff created the confrontation and animosity which forced him to offer to purchase plaintiff's share of stock, the date of valuation should be the date of the sale.
Both plaintiff and defendant recognize and cite N.J.S.A. 14A:12-7(8) as the controlling statute. Pursuant to N.J.S.A. 14A:12-7(8)(a):
The purchase price of any shares so sold shall be their fair value as of the date of the commencement of the action or such earlier or later date deemed equitable by the court, plus or minus any adjustments deemed equitable by the court if the action was brought in whole or in part under paragraph 14A:12-7(1)(c).
Generally, the date of commencement of the action is the presumptive date of valuation. Musto v. Vidas, 333 N.J.Super. 52, 63, 754 A.2d 586 (App.Div.2000). However, by the express terms of the statute the trial judge may set the valuation at any time that is deemed equitable. Ibid.
Here, the trial judge determined that the proper valuation date of Schripps was February 28, 1997. The judge reasoned that "[t]he business was different after [plaintiff's termination] and was not in the control of the plaintiff who was the real manager." The judge noted that the plaintiff was willing to train defendant, but that arrangement was never negotiated successfully.
We find no abuse of discretion in the trial judge's decision to select February 28, 1997 as the date for valuing Schripps. See Grato v. Grato, 272 N.J.Super. 140, 161, 639 A.2d 390 (App.Div.), certif. denied, 138 N.J. 264, 649 A.2d 1285 (1994)(where majority dissolved corporation and activated a new corporation which purchased the original corporation's assets, the appropriate remedy was to value the assets prior to the sale). There was sufficient evidence on the record to support the judge's finding that the business had changed following plaintiff's departure. Chait testified there had been a "significant change" following plaintiff's departure from the business, including a decrease in the company's financial stability. Moreover, defendant and plaintiff both testified that defendant did not know how to run the day-to-day operations of the business. Further, in September 1997, defendant sold Schripps to a corporation he controlled for an amount less than the amount offered by plaintiff to acquire Schripps. See also Hughes, supra, 192 N.J.Super. at 66, 469 A.2d 74 (trial judge adopted the earlier date to value the stock because the increase in value could not be attributed to plaintiff). The decrease in the corporate value from February to September was not due to plaintiff's efforts, but may have been due to defendant's lack of experience in managing the corporation. Because plaintiff was terminated, it was fair not to ascribe the losses to plaintiff. Under these *926 circumstances, we find no abuse of the law judge's discretion determining that February 28, 1997, should be the date for valuing Schripps.

IV
In his cross appeal plaintiff argues that the trial judge erred in denying him counsel fees and prejudgment interest. Defendant argues that he acted in good faith and the trial judge properly exercised his discretion in denying counsel fee.
Under N.J.S.A. 14A:12-7(10) the award of counsel fees is discretionary. That section provides:
If the court determines that any party to an action brought under this section has acted arbitrarily, vexatiously, or otherwise not in good faith, it may in its discretion award reasonable expenses, including counsel fees incurred in connection with the action, to the injured party or parties.
[N.J.S.A. 14A:12-7(10).]
A reviewing court should only reverse the trial judge's determination denying counsel fees if there was an abuse of discretion. Musto, supra, 333 N.J.Super. at 63, 754 A.2d 586. Here, the trial judge found that defendant did not act arbitrarily, vexatiously, or otherwise not in good faith in denying plaintiff attorneys fees. We agree and affirm the denial of counsel fees essentially for the reasons expressed by the trial judge.
Finally, the award of prejudgment interest is subject to the trial judge's broad discretion in accordance with principles of equity. Id.at 74, 754 A.2d 586. As we noted in Musto, "[w]e will defer to the trial judge's exercise of discretion involving prejudgment interest unless it represents a manifest denial of justice." Ibid. We find no such manifest denial of justice in the denial of prejudgment interest.

VI
In summary, we reverse and remand for the trial judge to determine the fair value of the corporation as of February 28, 1997. The trial judge should appoint an appraiser to receive and report to the trial judge on the issue of fair value of the corporation. N.J.S.A. 14A:11-8. We affirm the judge's order to use February 28, 1997 as the valuation date and the denial of counsel fees and prejudgment interest. We do not retain jurisdiction.
NOTES
[1] Defendant in the singular refers to Dan Marcus.