**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0108-20

STONE HARBOR ESTATES, INC.,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

KENNEDY FUNDING
FINANCIAL, LLC, and
KEVIN WOLFER,

      Defendants-Respondents/
      Cross-Appellants,

and

CB RICHARD ELLIS,
TIMOTHY GOLDEN, JR.,
JOHN J. LYNCH,
COLLIERS INTERNATIONAL,
GREGGIE D. PASCUAL, and
JAKE RAMAGE,

      Defendants,

v.

EDWARD ST. JOHN,

Third-Party Defendant.

_____

Argued October 31, 2023 – Decided December 20, 2023

Before Judges Whipple, Mayer and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-8363-15.

Thomas D. Flinn argued the cause for appellant/cross-respondent (Garrity, Graham, Murphy, Garofalo & Flinn, PC, attorneys; Thomas D. Flinn and Brian M. Gerstein, on the briefs).

Evan M. Goldman argued the cause for respondents/cross-appellants (Greenspoon Marder, LLP, attorneys; Evan M. Goldman, on the briefs).

PER CURIAM

Plaintiff, Stone Harbor Estates, Inc. (SHE) appeals, and Kennedy Funding Financial, LLC (KFF) and Kevin Wolfer cross-appeal, from a judgment and two post-judgment orders after a bench trial. We apply a deferential standard in reviewing factual findings by a judge from a bench trial, Balducci v. Cige, 240 N.J. 574, 594-95 (2020), yielding to the trial court "that heard the witnesses, sifted the competing evidence, and made reasoned conclusions," Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015). We review conclusions of law de novo. Manalapan Realty, L.P. v. Twp. Comm. of

Manalapan, 140 N.J. 366, 378 (1995). Utilizing that lens, we affirm for the reasons in the written decision after trial by Judge Estela De La Cruz.

Our decision is informed by the record. In 2011, Triad III, LLC (Triad), a holding company owned and controlled by William Bowman, obtained a twenty-four-month option to acquire residential land around Stone Harbor Golf Club in Middle Township and the permits attached to the land. Triad paid $5.29 million for the option, which included a purchase price of $5 million and an option fee of $290,000. In 2013, Bowman's former accountant, Edward St. John, established SHE to develop seventy duplex carriage homes and 132 single-family homes on the site's 202 lots. Triad assigned the option to SHE, in exchange for $13.5 million. Bowman is SHE's operations manager, and another of his companies, William Bowman Associates (WBA), was engaged in land development specializing in infrastructure work, such as preparing raw ground for building homes.

In order to pay Triad for the assignment and develop the property, SHE sought funding from KFF. On March 17, 2013, SHE applied for a $19 to $22 million loan from KFF. Bowman met with representatives of KFF, including Kevin Wolfer, KFF's President and CEO, to make a follow-up presentation. SHE understood any loan offer was subject to the appraisal of SHE's real

3

estate collateral. SHE had asserted the value of the collateral was worth over $24 million.

According to KFF and Wolfer, the negotiations were predicated on the misapprehension that the amount sought by SHE was a second mortgage designed to buy out a partner, Triad, and make the project more profitable—not money intended to satisfy the bankruptcy debt of Bowman's existing businesses. Wolfer testified Bowman misrepresented the purchase price of the property as $13.5 million—as opposed to $5 million for the underlying property plus an additional $8.5 million for Triad under its agreement with SHE—in order to claim that the overall value of the property was $27 million.

On March 12, 2014—almost a year after the parties' initial agreement to pursue a loan deal—KFF and SHE agreed in principle to a maximum loan of $19 million, with the exact amount to be determined by the "as is" value of the collateral combined with a projection of the "as completed" value. SHE paid KFF $95,000 as a fee for this loan commitment. The loan commitment also entitled both parties to elect the appointment of an independent third-party appraiser to make a binding appraisal in the event of a dispute.

The first appraisal was requested by KFF directly and was not the result of an election of an independent appraiser by either party as per their

4

agreement. It was performed by CB Richard Ellis (CBRE), which had a longstanding relationship with KFF. Wolfer testified Bowman was aware of this appraisal and was encouraged to share documentation with CBRE to facilitate a fair valuation.

CBRE issued its appraisal report in March 2014 (March appraisal). The March appraisal set the market value of the property at $12.7 million and the as-completed value at $19.3 million. Based on that appraised value and the loan agreement, KFF extended a total loan offer of $10.6 million and an initial advance of $7.6 million.

SHE did not immediately accept the loan offer, and it soon became clear that underlying assumptions in CBRE's March appraisal—especially as related to the permits—were not supported by the facts. When SHE submitted its initial loan request to KFF, SHE had final subdivision approval for seventy carriage homes and thirty-two single family homes and preliminary approval for the remaining one hundred lots, which were being held for a second phase of building single-family homes. SHE also had permits to install a water main extension and supply water to 177 lots. During the course of negotiations, SHE acquired permits to supply water to the remaining twenty-five lots.

5

When it was revealed SHE did not have final approval for all lots, or water permits for lots beyond the initial 177 issued, KFF directed CBRE employee John J. Lynch to conduct a new appraisal: treating SHE's project as if only 177 units could be built, lowering the discount rate to account for the lack of final approvals on 100 of the lots, and giving the 141 lots to be constructed after Phase 1, Section 1, only an as-is value—not an as-completed value. Lynch testified the instructions were delivered via telephone call, and he would not have made such changes without direction from Wolfer.

KFF did not disclose this second CBRE appraisal to SHE. This second appraisal was not formally used in a valuation of SHE's collateral by KFF, but it informed negotiations between the parties during the summer of 2014 on proposals which would have lowered the initial purchase price due from SHE to Triad and subordinated certain payments to Triad to give KFF a first mortgage on the property. After these negotiations, KFF revised its loan offer, lowering the offer to a total of $9.1 million with $6.1 million available as an advance.

SHE, dissatisfied with both the March appraisal from CBRE and KFF's loan offers, elected to seek and be bound by a new appraisal under the third-party appraiser provision of the loan commitment. Wolfer suggested Colliers

A-0108-20

International (Colliers), with which he had an extensive business relationship that he did not disclose to SHE. SHE accepted Wolfer's suggestion, unaware of the relationship between KFF and Colliers.

Wolfer disclosed the results of the second CBRE appraisal to Colliers' appraisers Greggie D. Pascual and Jake Ramage. During the appraisal process, Wolfer emailed the Colliers appraisers and told them to appraise under a discounted cash flow model and to calculate the discount rate and the price per lot. Wolfer also dictated how many lots the Colliers appraisers should consider finished—as opposed to unfinished—for the purposes of the evaluation. Those conversations affected the numbers the appraisers used in their models. The Colliers appraisal, issued September 22, 2014, appraised the value of the project as $7.1 million as-is, and $11.8 million as completed.

In his deposition, admitted at trial, Ramage explained that, to conduct this appraisal, he dealt with Bowman, inspected the site, and looked for comparable properties. Meanwhile, Pascual was running the models and preparing the actual appraisal report. Ramage stated Wolfer did not tell him anything about the terms of the loan commitment. Pascual, whose deposition testimony was also admitted at trial, disclaimed knowledge his valuation

7

would be used to determine any loan offer to be made by KFF to SHE, instead stating he was engaged by KFF to assist them in their loan underwriting.

Pascual did admit to making a calculation mistake by applying the wrong rate and, consequently, omitting an additional $3.22 million in value from his appraisal. After the mistake was discovered, Wolfer communicated directly with the Colliers appraisers and, even after the mistake was corrected, the appraisal still asserted the land was worth $7.1 million as is, and $11.8 million as completed. When asked about the same mistake, Ramage testified at his deposition he and Pascual simply did not feel comfortable with the higher appraised value after the mistake was identified, and they essentially used common sense to align the value of the model with the appraised value they had already delivered to Wolfer. The new calculation reduced the value of certain lots, based on their phases of construction, and Ramage testified that this recalculation kept the appraisal in line with comparable properties he reviewed.

Based on the Colliers report, KFF lowered its loan offer to $6.5 million. Further attempts at negotiation failed, the loan did not issue, and SHE's option expired. SHE sued KFF; Wolfer; CBRE and two of its appraisers, Lynch and

A-0108-20

Timothy Golden, Jr.;[1] and Colliers and two of its appraisers, Pascual and Ramage. The ten-count complaint against KFF, Wolfers, CBRE, Colliers, and the individual appraiser defendants alleged violations of the New Jersey Consumer Fraud Act, common law and equitable fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, professional negligence, tortious interference, and civil conspiracy. KFF and Wolfer answered and asserted a counterclaim against St. John, alleging non-payment of a commitment fee by SHE.

KFF and Wolfer filed for summary judgment. SHE's claims of violations of the New Jersey Consumer Fraud Act, unjust enrichment, and tortious interference were dismissed as to KFF and Wolfer. SHE's claims of breach of contract and breach of duty to negotiate in good faith as to Wolfer, individually, were dismissed as well. SHE's remaining claims were: common law fraud, equitable fraud, and civil conspiracy against KFF and Wolfer; and breach of contract and breach of the implied covenant of good faith and fair dealing as to KFF. The court also denied summary judgment to KFF and Wolfer for their counterclaim against St. John.

---

[1] SHE settled with CBRE, Lynch, and Golden, and those parties were dismissed by stipulation. Separately, SHE settled with Colliers, Pascual, and Ramage, and those parties were dismissed by stipulation.

A-0108-20

Trial began on December 2, 2019. After trial, KFF's counterclaim against St. John was dismissed, pursuant to Rule 4:37-2. On May 12, 2020, Judge Estela De La Cruz issued her written opinion finding KFF violated the implied covenant of good faith and fair dealing and ordered KFF to pay back the $236,000 in fees SHE spent attempting to secure a loan. However, the judge did not find the evidence showed defendants committed fraud, engaged in a civil conspiracy, or breached the actual terms of the contract. As to claims of lost-profits damages, the trial judge found they were not supported by the evidence and were speculative, exaggerated, and not based on reliable factors.

KFF, Wolfer and SHE all moved for reconsideration. On July 28, 2020, the court granted KFF and Wolfer's reconsideration motion and denied SHE's motion. These appeals followed.

I.

SHE argues the court erred by not finding elements of a civil conspiracy. In both its initial opinion and the opinion related to the motions for reconsideration, the trial court made extensive factual findings about the conduct of Wolfer, CBRE and its employee Lynch, as well as Colliers and its employees Ramage and Pascual. The court found Wolfer had unusual communications with independent appraisers before the appraisal report was

finalized, and Lynch would not have changed his appraisal unless Wolfer had asked. Although Lynch lowered the valuation from the March 2014 appraisal report, the trial court found no evidence those appraisers were involved in any scheme or conspiracy to inflict wrong against or upon SHE.

As to the Colliers appraisers, the court found Wolfer influenced that process as well, he provided a copy of the CBRE appraisal to these supposedly independent appraisers, and later he feigned lack of recollection of his conversations with Colliers's appraisers at trial. The trial judge was highly critical of the process but found no underlying agreement to harm SHE.

In her opinion denying reconsideration, the trial judge re-emphasized that Wolfer's poor conduct was ultimately a "manipulation of the process, for the benefit of [Wolfer's] company." However, there was no evidence in the record the appraisers agreed with Wolfer to harm SHE, St. John, or Bowman.

SHE argues that KFF, knowing it was lending to a vulnerable entity, purposely kept SHE interested in its services to collect up-front fees, despite KFF's disinterest in the actual loan.

The evidence here did not compel the trial court, nor does it compel us, to conclude that CBRE, Colliers, or their employees manifested the level of understanding or assent to cause specific harm to SHE required to satisfy the

11

elements of civil conspiracy; there was little from which to infer an express or implied agreement by any of them to conspire against SHE. The appraisers were simply reacting to unilateral directions from the person who hired them. Civil conspiracy requires them to have understood and accepted the directions as a scheme to harm SHE. Those elements of civil conspiracy are not satisfied on this record.

SHE next argues that Bowman's damage calculations should have been accepted and, thus, the court should have awarded lost-profits damages. Specifically, SHE argues KFF's misdeeds alone prevented it from realizing significant profits. The trial court declined to award lost-profits damages, finding them too speculative, and we agree.

At trial Bowman presented documents to demonstrate SHE's lost-profits damages from this venture: a hypothetical "lost profit projection" made by Bowman based upon the assumption that the property had been acquired for $5 million. Bowman's projection assumed the development costs would be funded by a pre-development sale of twenty-two lots to interested builders and all 202 lots would be improved and sold by the fourth quarter of 2021. It also presumed SHE would have closed its land acquisition loan, with a twelve percent interest rate, by the first quarter of 2017, and would repay the Triad

12

Oversight Board in the first quarter of 2020. Additionally, the projection factored in escalation pricing—where lot prices increase over time—and certain premiums for larger or particularly well-suited lots. The projection presumed a lot price of $250,000 for single family home lots and $135,000 for carriage house lots, without escalation pricing, for a projected revenue of $43.7 million and projected additional revenues of $4.01 million related to the sale of golf course memberships. As a result, the projection showed that SHE could pay off the loan to KFF between March 2014 and the third quarter of 2015 by paying seventy percent of the sale proceeds from each lot to KFF, and that SHE could fund a $6 million obligation to the Triad Oversight Board by the fourth quarter of 2015.

Bowman agreed at trial the methodology he used to project lot sales was not consistent with CBRE's and testified that he continued to work with and modify the document, specifically relating to the valuation of the property and the potential KFF loan. In an email exchange between Bowman and Wolfer, Bowman wrote "I am not qualified to make a determination of how many units will sell within a given period of time."

Bowman conceded many of the projections he used were not borne out by later developments—such as plans to build a recreation center that did not

A-0108-20

materialize—and the projected brokerage commission, loan commitment, and loan fees ended up being inaccurate when compared to the terms SHE was willing to accept to obtain a loan from KFF. Bowman formed his opinion on market values of lots based on talks with "certain builders."

In support, SHE proffered as a financial expert Certified Public Accountant Edward Waddington. Waddington did not engage in an "independent analysis" of Bowman's damage calculations but instead testified that the way Bowman approached the sell out and the way he modeled cash flow were "extremely reasonable" and the sale prices were consistent with the sale prices in Colliers's independent appraisal. Regardless, the trial court characterized SHE's lost-profits damages claim as "not reasonable and . . . based on wishful speculation and uncertainties" and explained in detail the basis for such a conclusion.

The court emphasized that Bowman, not an expert, submitted the damages flow charts. Furthermore, the court noted with disapproval that the damages report anticipated every decision would work to Bowman's benefit, he would realize full profit from every lot sold, and he would sell every lot. The projections did not include a completion reserve, prepayment of interest,

14

commitment fees, closing costs, legal fees, repayment to KFF of at least seventy percent of the sale price, or repayment to the Triad Oversight Board.

The trial court "is not bound to accept the testimony of an expert witness, even if . . . unrebutted by any other evidence." Torres v. Schripps, Inc., 342 N.J. Super. 419, 431 (App. Div. 2001) (citing Johnson v. Am. Homestead Mortg. Corp., 306 N.J. Super. 429, 438 (App. Div. 1997)). Rather, the fact-finder should use its "common sense and experience" to determine the weight expert testimony merits. Id. at 430. "The fact[-]finder may accept some of the expert's testimony and reject the rest." Ibid. (citing Todd v. Sheridan, 268 N.J. Super. 387, 401 (App. Div. 1993)).

The trial court's rulings are well supported. SHE was created for the purpose of pursuing one large, but compromised, transaction. For a variety of reasons, all of which would weigh on the future profitability of that transaction, the transaction failed. SHE is not entitled to any further relief under these circumstances. In addition, the holding in Schwartz v. Menas reinforces the principle that it is "more difficult" to project the future profits of a new business. 251 N.J. 556, 561 (2022) (citing Restatement (Second) of Contracts § 352 cmt. b (Am. L. Inst. 1981)) ("[I]t is substantially more difficult for a new business to establish lost profits damages with reasonable

15                                                                                    A-0108-20

certainty than it is for an established business to do so.").  The record shows, in addition to being a new business, SHE faces other obstacles to a projection of profitability.

II.

KFF cross-appeals, arguing the trial court erred in determining it breached the implied covenant of good faith and fair dealing.  KFF argues it did not demonstrate "bad motive" under the standard of Wilson v. Amerada Hess Corp., 168 N.J. 236 (2001), and, thus, the trial court's finding was erroneous.  We disagree, as the record supports the finding that KFF did breach the implied covenant of good faith and fair dealing.

In rendering final judgment, the trial court made extensive factual findings on the actions and intentions of Wolfer, not as an individual but as a member of KFF.  The court found:  Wolfer had undisclosed contact with CBRE related to the second appraisal conducted by Lynch; the testimony of Lynch shows Wolfer "plainly having unusual communications with 'independent' appraisers before the appraisal report was finalized"; and Lynch "wouldn't have changed the appraisal unless Mr. Wolfer asked."  As a result, it was "evident that Mr. Lynch tinkered with and lowered the valuation from his

16

March 28, 2014 appraisal report," and "the appearance of conflict is compelling."

The court also found Wolfer influenced Colliers's valuation from the start by providing Colliers a copy of Lynch's interim appraisal report. Finally, the court found: Wolfer feigned lack of recollection of his conversations with Colliers's appraisers; on the contrary, Wolfer had telephone conversations as well as email contact with the Colliers appraisers; certain permitted lots were evaluated as if they still lacked water permits based on "Wolfer's direct influence and instruction, without any documented research on the point by Colliers"; and when SHE discovered an apparent, significant, mathematical error, the Colliers appraisers offered to resolve the situation by increasing the discount rate and devaluing individual lots so it could back into the same valuation it had provided in the mistaken appraisal.

The trial court stated, "Colliers had no business whatsoever to propose valuations to Mr. Wolfer from which to choose from, and this appears to be a wheeling-and-dealing of the values [that] obliterates the independence of the appraisal evaluation that SHE relied upon." It concluded that "plaintiff SHE has proven that defendants breached the covenant of good faith and fair dealing by a preponderance of the credible evidence."

17

The implied covenant of good faith and fair dealing is present in every contract made under New Jersey law. Wilson, 168 N.J. at 244 (citing Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997)). Contractual bad faith or unfair dealing requires a showing of "improper motive." Id. at 251 ("Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance."). "[E]vidence of bad motive may be established through circumstantial evidence," such that the bad motive of a party "may be inferred from all that he did and said, and from all the surrounding circumstances of the situation under investigation." Id. at 253-54.

Here KFF, in the person of Wolfer, demonstrated bad motive in the performance of a contract by manipulating the conduct of supposedly independent contractors. As the trial court noted, Wolfer's bad motive was evident in his dealings with the appraiser defendants. The court found that Lynch, acting on behalf of CBRE, lowered his valuation because Wolfer asked him to. This finding is both direct evidence and supported by the record.

Wolfer's conduct as to the Colliers appraisers was even more egregious. Wolfer directed the Colliers appraisers to use an appraisal from another company as a baseline—a baseline he had already manipulated. This

18

maneuver operated to ensure the projected future value of the property—and, thus, the value of the property as collateral against KFF's loan—would not increase in response to the contracted for and specifically elected independent appraisal that was conducted by Colliers. Wolfer actively engaged with Colliers employees Ramage and Pascual to manipulate individual components of the final appraisal. Finally, Wolfer attempted to conceal those contacts by feigning a lack of recollection at trial. Wolfer's malignant motive is well demonstrated and amply supported by the record, the evidence is more than circumstantial, and Wolfer was acting on behalf of KFF.

SHE's interest was frustrated in this instance because KFF actively worked to undermine the appraised value of SHE's collateral, decreasing the size of the loan. The record supports the court's findings that Wolfer engaged in a deep deception intended to deflate the value of a loan to SHE and Wolfer's conduct frustrated SHE's purpose in seeking the benefit of a KFF loan to secure the option.

Finally, KFF asserts the trial court erred by declining to enforce a limitation on damages clause in the contract between KFF and SHE and that the damages awarded to SHE at trial were further inappropriate because SHE and KFF both had business acumen and both had access to counsel to review

19

the transaction. KFF asserts it was SHE's "failure to act with the requisite promptness and diligence" that caused SHE to surrender the fees it paid to KFF. We conclude the trial court properly analyzed the availability of such a defense.

The limitation clause in the loan agreement between KFF and SHE states, in part, that the "LENDER SHALL HAVE NO LIABILITY TO BORROWER, OR ANY OTHER ENTITY OR PERSON, UNDER ANY THEORY OF LAW OR EQUITY FOR ANY AMOUNT IN EXCESS OF THE PAID PORTION OF THE COMMITMENT FEE."

Citing Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369, 377-78 (App. Div. 1960), the trial judge found KFF "acted with bad intentions which deprived plaintiff of its expectation of good faith and fair dealing on both sides." There is no basis to disturb the trial court's finding that KFF's breach of the implied duty of good faith and fair dealing foreclosed KFF's argument to apply the limitation on damages clause.

The arguments that the damage award should be reversed because SHE was not diligent in pursuing the deal and because the parties had relatively equal skill and negotiating power are unavailing. Questions related to diligence, access to counsel, and the relative positions of the parties do not

implicate the question faced by the trial court. The question faced by the trial court is whether KFF, which demonstrated "bad motive," could assert a limitation on damages clause against SHE. Based on this record, we agree it could not.

Any remaining arguments raised by the parties are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0108-20