**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0218-23

RANDEE K. JENNINGS, individually
and derivatively on behalf of GLOBAL
NETWORK SOLUTIONS LLC,

     Plaintiff-Appellant,

v.

CARL F. SIMMONS and GLOBAL
NETWORK SOLUTIONS LLC,

     Defendants,

and

RAYMOND FISCHER and
JULIAN CAPROW,

     Defendants-Respondents,

and

GLOBAL NETWORK SOLUTIONS LLC,

     Third-Party Plaintiff,

v.

THE CIRRUS GROUP, LLC,

Third-Party Defendant/
Respondent.

_____

Argued January 9, 2025 – Decided February 13, 2025

Before Judges Natali, Walcott-Henderson, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-0220-20.

Megan Knowlton Balne argued the cause for appellant (Hyland Levin Shapiro LLP, attorneys; Megan Knowlton Balne, of counsel and on the briefs; Paige A. Joffe, on the briefs).

Robert S. Raymar argued the cause for respondents Raymond Fischer and Julian Caprow (Hellring Lindeman Goldstein & Siegal LLP, attorneys; Robert S. Raymar and Bruce S. Etterman, on the brief).

PER CURIAM

In this minority shareholder oppression matter, plaintiff Randee K. Jennings appeals from a May 8, 2023 judgment dismissing her claims against defendants Global Network Solutions LLC (GNS), Carl F. Simmons, deceased former principal of GNS,[1] and GNS members Raymond Fischer and Julian Caprow, following a bench trial. Plaintiff also appeals from two post-trial orders

_____

[1] Simmons died on April 16, 2022 during the pendency of plaintiff's litigation against him.

A-0218-23

entered on June 26, and August 30, 2023, denying her motion for reconsideration, motion to compel, and motion to reinstate her complaint. We affirm.

I.

GNS was a technology and telecommunications company formed in 2014 with Simmons as its President and Chief Executive Officer (CEO). Plaintiff served as GNS's Senior Vice President and Chief Information Officer primarily responsible for supporting sales. In that role, plaintiff procured nearly all of GNS's clients. Plaintiff also hired five other employees, who reported directly to her. Fischer was GNS's Senior Vice President of Business Development and Caprow, its Executive Vice President and Chief Financial Officer (CFO).

Beginning in the fall of 2014, Simmons rented a home in Bernardsville, which also served as GNS's office. Plaintiff and Simmons resided in the Bernardsville home in the early days of the business. Simmons paid the rent and plaintiff paid the utilities. Fischer also resided in the home from January 2016 to October 2017. Caprow resided in California.

3

According to plaintiff, Simmons offered her a salary of $150,000 and a ten percent equity stake in GNS, the same as Fischer and Caprow.[2] No operating agreement or valuation of GNS was moved into evidence and the court had no reliable means to valuate GNS shares, stating "Simmons was in sole possession of GNS's financial documents of GNS, and he is deceased." Also relevant to plaintiff's financial claims, the record includes a separate 2014 GNS employment agreement (Employment Agreement) which required an equity buy-in "through personal investment, salary set off, or other means, [to] fund initial GNS start-up resourcing needs with an investment amount of $200,000." Plaintiff did not pay cash for her ten percent shares, instead, she invested $200,000 in "sweat equity."

In a November 1, 2015 letter, Simmons and Caprow informed plaintiff her $200,000 buy-in was satisfied by way of salary reduction over a two-year period. The letter also advised plaintiff "receipt of [ten percent] equity in the company instead of compensation of $200,000 as described above, will be filed on a schedule K-l . . . for 2015. This may have a tax consequence to you, and you should consult with your tax advisor/accountant."

---

[2] The operating agreement is not part of this record. According to Fischer, there was also an amended operating agreement, which is also not part of this record.

The Employment Agreement set plaintiff's compensation at $150,000 per year, effective August 15, 2014 through December 31, 2015. Additionally, it provided for a $1,500 monthly housing allowance, one monthly round-trip ticket to Florida where she resided with her family, a laptop, a credit card with an initial limit of $1,500 to cover business expenses, and "[c]ompensation for 2015 and beyond." It is undisputed plaintiff never received an annual salary of $150,000 and GNS never issued plaintiff GNS share certificates or K-1s, and at trial, Caprow testified he had no knowledge that plaintiff was a partner of GNS, which is why he did not issue her a K-1.

It is also undisputed plaintiff received no income from GNS in 2014. GNS issued plaintiff a 1099-MISC (1099) for miscellaneous income and reportedly paid plaintiff $49,200 in "nonemployee compensation," which plaintiff learned only through an IRS investigation. GNS's profit and loss statement listed paying plaintiff $3,000 for consulting expenses in 2014, which Caprow explained was paid directly to plaintiff's Florida homeowners' association for her benefit.

In 2015, GNS issued plaintiff a second 1099 for miscellaneous income in an amount of $19,786.34. Plaintiff received no salary or bonus in 2015 from GNS, but she did receive wire transfers of $5,774 into her bank account from Caprow. Caprow explained the $19,786.34 attributed to plaintiff as income was

5

for direct payments to plaintiff's Florida homeowners' association fees and utility company.

In 2016, GNS issued plaintiff another 1099 for miscellaneous income which reported paying plaintiff $82,160.28. GNS's profit and loss statement also listed paying plaintiff $82,160.28 for consulting expenses in 2016, of which plaintiff contends she received only $61,378.

In 2017, GNS issued plaintiff a final 1099 for miscellaneous income which reported paying plaintiff $63,760.06. Consistent with the 1099, GNS's profit and loss statement listed paying plaintiff $63,760.06 for consulting expenses in 2017. According to plaintiff, she received $65,101.

Fischer was offered a similar employment agreement to that of plaintiff.[3] He testified the $150,000 salary in the agreement was not a real salary but a goal to legitimize GNS and attract further funding from potential private equity investors. Like plaintiff, Fischer never received $150,000 in annual salary. He testified that he did not expect it. Instead, he earned $36,284.03 in 2015, $54,900.00 in 2016, and $66,500.00 in 2017. Fischer also allowed Simmons to use his personal credit card for GNS expenses, resulting in a balance of $45,000 including interest.

---

[3] Plaintiff included Fischer's unsigned employment agreement in her appendix.

6

Caprow had a similar employment agreement to Fischer and he testified he understood the agreements were pro forma documents that were used to show potential investors. He was aware GNS had no ability to pay any employee $150,000, particularly in 2013-2014, when there were no substantial clients or income generated. Caprow was paid $30,000 in 2016, $65,000 in 2017, and reimbursed $84,000 ($73,324.04 loan, plus interest) when the Heritage Group (THG), GNS's principal client, bought the remaining contracts after plaintiff left GNS.

According to testimony presented at the bench trial, given GNS's limited revenue, Simmons executed promissory notes as CEO of GNS, which he gave to non-member employees for unpaid salaries. According to plaintiff, the "employees subsequently filed claims with the New Jersey Department of Labor and received compensation in 2020. GNS was required to pay fees and fines to the State of New Jersey."

Simmons used the GNS account as his personal checkbook and paid personal expenses out of GNS's account. Simmons purchased horses and paid for their boarding using GNS monies. He also used GNS monies to pay $20,000 for cosmetic dentistry. Plaintiff claimed Simmons purchased $20,000 in alcohol and $1,400 in massages using GNS funds.

7

Further, Simmons required executives to add his name to their personal bank accounts to receive compensation through direct transfers. According to plaintiff, he applied for and received a debit card from her bank account, which she immediately cancelled.

Caprow complained about this comingling but did not believe this was "worth blowing up the company over." He testified he would just "charge it to . . . Simmons as income." Similarly, plaintiff confronted Simmons many times about his using GNS money starting in 2016, but without result. Fischer did not have access to GNS accounts and did not observe Simmons mishandling funds. He made some inquiries into the funds at times, which Simmons did not fully answer.

On December 17, 2017, plaintiff and Simmons had a physical confrontation at the Bernardsville home office. According to plaintiff, "Simmons planned to sell all GNS contracts and residual streams to [THG] and cash out the contracts, without knowledge or approval of . . . Fischer or . . . Caprow." Simmons pushed plaintiff and pinned her to the ground, and, as a result, plaintiff suffered contusions on her lip, arms, and leg and fled the home barefoot. Police arrived and determined plaintiff was the aggressor, as a result

of Simmons' misrepresentations, and she was charged with assault and incarcerated in jail for one week.

Plaintiff filed for a temporary restraining order (TRO). At the final restraining order hearing, the Family Part judge determined "Simmons physically assaulted plaintiff, lied to the police . . . ransacked her apartment, and terminated [her] from . . . [GNS]." Simmons terminated plaintiff from GNS after she refused to sign a termination agreement he sent to her.

Following plaintiff's termination from GNS, Simmons sent an email to Fischer and Caprow, stating:

> [Plaintiff] leaving has a major impact on GNS, and for many of you personally. Shared loyalty for a person and a company is understandable and acceptable in organizations. However, at a time like this, divided loyalty, if it exists, must be identified. Only you can choose if continuing at GNS is possible without [plaintiff]. Stay with GNS enthusiastically, or leave responsibly[.]

Shortly after, THG fired GNS, citing its dissatisfaction with progress on its contract. GNS sued THG, alleging breach of contract, which resulted in a financial settlement of $1,028,000 to GNS in full satisfaction of GNS's claims against THG.

Following that settlement, GNS reimbursed Caprow $84,000, inclusive of the original loan amount of $73,324.04 plus accrued interest. GNS also

9

reimbursed Fischer $45,000, inclusive of credit card fees and interest owed to Fischer, and $40,000 in rental arrears.

On September 11, 2018, plaintiff formed a new company, the Cirrus Group (TCG). Plaintiff was TCG's sole owner and employee. On February 13, 2020, plaintiff filed a pro se complaint against defendants[4] seeking to recover unpaid wages and redeem a ten percent equity share in GNS.[5] GNS and Simmons answered and counterclaimed alleging breach of contract; breach of fiduciary duty; tortious interference against plaintiff and TCG; and unjust enrichment against plaintiff and TCG.

Simmons died on April 16, 2022. Plaintiff did not move to substitute Simmons's estate as a party.

---

[4] Although plaintiff initially appeared pro se in this litigation, there were times when plaintiff retained counsel; however, by the time of the bench trial, plaintiff was self-represented.

[5] On April 3, 2020, plaintiff filed an amended complaint and order to show cause against GNS, Simmons, Fischer and Caprow for minority shareholder oppression, financial malfeasance, company mismanagement, waste, and theft. At the time of this filing, plaintiff was represented by counsel. Plaintiff filed a second amended complaint on April 10, 2020, alleging among other counts: the dissolution of GNS; removal, expulsion and/or disassociation of Simmons and other members from GNS; unjust enrichment; veil piercing; breach of fiduciary duty; self-dealing; negligence; waste; and tortious interference.

A-0218-23

The remaining parties consented to a bench trial. On the second day of trial, the court called all counsel into chambers for a conference. Plaintiff, who was self-represented at the time, was excluded from this conference, even though counsel representing plaintiff's company, TCG, attended.

At the close of testimony, the court heard the parties' cross-motions to dismiss pursuant to Rule 4:37-2(b). The court granted plaintiff's motion to dismiss GNS's counterclaims which alleged tortious interference with contract and unjust enrichment.

The following claims remained for disposition by the court: plaintiff's claims against GNS, Simmons, Fischer, and Caprow for an order of dissolution of GNS; expulsion of Simmons from GNS; unjust enrichment; piercing the corporate veil; breach of fiduciary duty; self-dealing; negligence; waste; tortious interference with plaintiff's economic advantage; tortious interference with plaintiffs prospective economic gain; accounting; appointment of a custodian and provisional director under the New Jersey Oppressed Minority Shareholders Statute, N.J.S.A. 14A:14-7 (NJOMSS); and attorneys' fees. Further, GNS's counterclaims against plaintiff for breach of contract and breach of fiduciary duty also remained.

A-0218-23

Following the three-day bench trial, the court issued a fifty-eight-page written opinion, finding all counts seeking to "remove, expel, or disassociate . . . Simmons from GNS" were "denied as moot as . . . Simmons is deceased," and his estate was never substituted into the litigation.

The court found "it is undisputed that plaintiff brought tremendous value to GNS with her contacts, clients, and technical skills and knowledge," as neither Fischer nor Caprow brought in any clients. The court further found Fischer was not given access to, or knowledge of GNS's financial accounts despite his title and was instead directed to perform mostly menial tasks. As to Caprow, the court found his duties were "akin to a bookkeeper in his limited role with GNS," despite holding the title of CFO. The court concluded Simmons controlled all GNS's bank accounts.

The court found plaintiff, Fischer, and Caprow to be generally credible witnesses. The court concluded "plaintiff was generally credible" though she "overstated her own credentials and aptitude"; and both Fischer and Caprow were "generally credible, although . . . Fischer on cross-examination frequently responded with 'I don't recall' or 'I can't remember.'" The court found "Fischer and . . . Caprow corroborated each other's characterization of . . . Simmons as a dictator and the only voice of GNS."

As to count one, the court explained:

> [I]t is in the best interests of the remaining members of GNS to dissolve the company. . . . Simmons ran the company into the ground through his self-dealing and financial mismanagement. GNS commenced its downward spiral in 2017 and quickly imploded after plaintiff was terminated, all GNS technical employees left en masse, and all clients abandoned GNS due to its inability to service contracts. There is nothing left of GNS, not even its founding member . . . Simmons.

The court denied plaintiff's request to appoint a receiver or special fiscal agent for GNS and for an accounting of all GNS operations, finding each would be "unproductive three years after GNS ceased operations." The court explained, "[a]lthough the court has the statutory authority to make . . . an appointment 'in the best interests of the limited liability company and its members,' there is no point, especially because there is nothing to manage."

As to the unjust enrichment count, the court determined although "[p]laintiff maintained that she was not fully compensated for her contributions to GNS," she "did not provide the court with a reasonable valuation formula to calculate the fair value of [her] GNS shares." In total, plaintiff claimed she was due a total wage and equity income of $762,500. She explained the total represented $512,500 from 2014 through 2017, based on the Employment Agreement, and $250,000 based on the fact Fischer, who was also a ten percent

member, was paid $248,000 in consulting fees. The court, however, found the Employment Agreement was not a reliable basis for determining plaintiff's compensation, noting it was a "sham" arrangement meant to impress potential investors, and that no executive was paid anywhere near $150,000 from 2014 to 2017. The court also noted the Employment Agreement itself was only in effect from August 15, 2014 to December 31, 2015. Therefore, even if it were found to be an enforceable agreement, it would have expired long before plaintiff's employment was terminated.

The court further found it could not calculate the value of plaintiff's ten percent equity interest, noting that the "only information on which the court is presented to calculate the value of GNS share is GNS'[s profit and loss statement]," which shows the net revenue of GNS from January 2014 through December 2020 "fluctuated wildly" between $15,064.01 and negative $349,371.70. And, "[w]ithout an expert report or other reliable means of valuating GNS . . . plaintiff [did] not prove[] by a preponderance of the evidence that she [was] entitled to $250,000 for her [ten percent] share of GNS."

As to breach of fiduciary duty, the court found "no credible evidence presented" that "Fischer and . . . Caprow conspired with . . . Simmons." The court reasoned "Simmons'[s] dictatorial nature does not translate to breach of

fiduciary duties by [] Fischer and [] Caprow," as "Simmons controlled the finances of GNS alone, and only he [was] responsible for GNS'[s] demise," and Fischer was not a signatory to GNS's account and Caprow's role as CFO was extremely limited as Simmons controlled all four GNS bank accounts.

With respect to plaintiff's claim of self-dealing and waste, the court determined "[t]he overwhelming evidence was that . . . Fischer and . . . Caprow made financial contributions to GNS." The court found "[t]hat both . . . Fischer and . . . Caprow were reimbursed for their contributions after the legal settlement with [THG] does not translate to self-dealing," and absent credible proof "Fischer and . . . Caprow intentionally failed to act in the face of a known duty to act and enriched themselves, plaintiff's claims for . . . self-dealing, and waste against . . . Fischer and . . . Caprow are dismissed with prejudice."

As to plaintiff's negligence count, the court found "[p]laintiff failed to prove how defendants Fischer and Caprow owed a duty to plaintiff as an equal member of GNS and how they breached that duty." The court therefore dismissed plaintiff's negligence claims, finding "[a]bsent proof of duty or breach of that duty, plaintiff s claim for damages against defendants Fischer and Caprow arising out of negligence [are] dismissed."

The court rejected plaintiff's efforts to pierce the corporate veil. It noted "plaintiff must prove (1) unity of ownership interest such that the separate personalities of the corporation and individual no longer exist, and (2) that if the acts are treated as those of the corporation alone, an inequitable outcome will result. Shotmeyer v. N.J. Realty Title Ins. Co., 195 N.J. 72, 86-87 (2008)." The court reasoned "[w]here the plaintiff fails to prove the corporate officer was in a position to prevent the occurrence of the corporate violation or was in a position to prevent the occurrence of the violation but failed to do so, individual liability cannot be imposed." See Macysyn v. Hensler, 329 N.J. Super. 476, 487 (App. Div. 2000). The court concluded

> the record is devoid of any facts establishing that defendants Fischer and Caprow were indistinguishable from GNS. . . . Fischer had no access to the bank accounts or finances of GNS. . . . Caprow was [CFO] of GNS in name only; . . . Simmons controlled GNS. It was undisputed that . . . Simmons maintained the checking, savings, payroll, and expenses accounts for GNS. . . . Caprow followed reporting instructions, as directed by . . . Simmons. . . . Simmons told . . . Caprow how and how much to pay employees, how to classify employees for tax purposes, and how to book expenses. . . .Simmons controlled GNS with an iron fist.

As to plaintiff's claim alleging tortious interference with plaintiff's economic advantage and prospective economic advantage, the court noted "the

16

claims against GNS are dismissed since a cause of action for tortious interference cannot lie against a party to the contract."

The court further found "there is not one scintilla of evidence adduced at trial to support plaintiff's claim that [Fischer and Caprow] wrongfully interfered with her employment or operating agreement . . . Plaintiff failed to articulate how defendants Fischer and Caprow interfered with plaintiff's prospective economic or contractual relationship."

With respect to plaintiff's minority shareholder oppression claim brought pursuant to the NJOMSS, N.J.S.A. 14A:12-7(1)(c), the court explained that "[b]ased on the evidence presented, there is no question that . . . Simmons is guilty of minority shareholder oppression." The court considered the testimony which showed that "Simmons physically assaulted plaintiff, lied to the police, charged plaintiff with assaulting him, had her incarcerated, ransacked her apartment, and terminated plaintiff from the company." However, the court reasoned those findings "do not spill over to . . . Fischer and . . . Caprow. They were equal shareholders and were dominated by . . . Simmons. The actions of . . . Fischer and . . . Caprow cannot be placed in the same category as . . . Simmons."

17

Finally, as to attorneys' fees, the court noted "[t]he party seeking attorney[s'] fees has the burden to prove that its request for attorney[s'] fees is reasonable." The court granted plaintiff fourteen days to file a certification in conformance with Rule 4:42-9 and R.P.C. 1.5(a) to calculate the attorney[s'] fees chargeable to GNS. Plaintiff did not submit the required certification pursuant to Rule 4:42-9, and the court did not award fees.

Plaintiff filed several post-trial motions seeking reconsideration and to compel Fischer and Caprow to provide emails and other relief.[6] Beginning on May 28, 2023, plaintiff moved for reconsideration of the court's May 8, 2023 decision on the valuation of her salary and equity interest in GNS, and its decision not to appoint a special receiver. In the same motion, plaintiff also sought reconsideration of the court's dismissal of her claims against Caprow and Fischer and access to the GNS email.

On June 26, 2023, the court denied plaintiff's motion for reconsideration, stating "plaintiff did not provide the court with a reasonable valuation formula to calculate the fair value of GNS shares, plaintiff's request for an order that all GNS assets and future income and revenue be deposited into the Superior Court

---

[6] We address only those motions that are pertinent to our determination of the issues raised in plaintiff's appeal.

Trust Fund was also denied." The court further determined that as to Fischer and Caprow, "plaintiff acknowledges much of the alleged 'bad acts' committed are 'unprovable.'"

On June 8, 2023, plaintiff moved to compel defendants to turnover control of GNS's bank accounts to plaintiff and Fischer. On June 22, 2023, plaintiff moved to reinstate GNS because "it ha[d] been prematurely dissolved by [Caprow]." Plaintiff also sought an order requiring Fischer and Caprow to return the funds that were withdrawn during the pendency of her application and for the court to appoint a receiver.

Although plaintiff did not formally move for reconsideration of the court's order and decision of May 8, 2023, the court considered her applications under the reconsideration standard and issued a single order, denying reconsideration on August 30, 2023. In its order of August 30, 2023, the court denied plaintiff's motion as untimely under Rule 4:49-2.[7] Additionally, the court found "[p]laintiff did not meet the standard to satisfy a [m]otion for [r]econsideration . . . [she] only relitigated prior factual assertions and has not offered any reason

---

[7] At the time, there were two outstanding motions pending from June 8, and June 22, 2023, referred to by the parties as plaintiff's "second" motion for reconsideration. The record includes only the August 30, 2023 order denying reconsideration.

as to why the court erred in its prior decision."  We discern the court's order disposed of the two pending motions.

## II.

Our review of a judgment entered following a bench trial is very limited and deferential.  D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013).  When the trial judge acts as the fact finder in a bench trial, we "must accept the factual findings of" that trial judge, when such findings "are 'supported by sufficient credible evidence in the record.'"  State v. Mohammed, 226 N.J. 71, 88 (2016) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)).  We will "'not disturb the factual findings and legal conclusions of the trial judge' unless convinced that those findings and conclusions were 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'"  Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

"Deference is particularly appropriate when the court's findings depend on credibility evaluations made after a full opportunity to observe witnesses testify, Cesare v. Cesare, 154 N.J. 394, 412 (1998), and the court's 'feel of the case.'"  Accounteks.Net, Inc. v. CKR L., LLP, 475 N.J. Super. 493, 503 (App.

Div. 2023) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "In reviewing the judge's findings, '[w]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence.'" 160 W. Broadway Assocs., LP v. 1 Mem'l Drive, LLC, 466 N.J. Super. 600, 610 (App. Div. 2021) (alteration in original) (quoting Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008)). "However, we owe no deference to the judge's interpretation of the law and the legal consequences that flow from established facts." Ibid.

On appeal, plaintiff contends the court incorrectly valued her equity shares in GNS. She further contends the court should have appointed an independent expert to value GNS. Plaintiff also argues the court improperly dismissed her claims against Fischer and Caprow and denied her request to appoint a receiver or fiscal agent for GNS. Plaintiff further argues the court's decision to have an ex-parte conference with counsel during the time she was self-represented constitutes plain error warranting reversal of its judgment. She argues the court's error "clearly implicated [her] ability as a pro se litigant to have her matter fairly heard."

In their merits brief, defendants Fischer and Caprow argue "[p]laintiff's appeal should be rejected as it was not timely filed, except as to plaintiff's

second motion for reconsideration."  With respect to plaintiff's appeal of the court's May 8, 2023 order, defendants assert "plaintiff's time to file her [n]otice of [a]ppeal of the [j]udgment expired on July 21, 2023, [twenty-five] days after the [May 28] motion was denied by the [June 26] [o]rder."  As to plaintiff's appeal of the June 26, 2023 order denying her motion for reconsideration, defendants contend it "is also not timely, as plaintiff's notice of appeal was not filed until September 21, 2023, 87 days later, far beyond plaintiff's 45 days for appeal."

Having considered the record and the parties' arguments, we affirm substantially for the reasons set forth in the court's May 8, June 26, and August 30, 2023 decisions.  We add the following comments.

III.

A.

As a preliminary matter, we address the timeliness of plaintiff's appeal before us and conclude plaintiff's appeal of the court's May 8, 2023 judgment was timely filed under Rule 2:4-1.  Plaintiff contends the "May 8, 2023 [o]rder was not final because . . . there were outstanding issues pending before the [t]rial [c]ourt," and the court's judgment was not final until the August 30, 2023 order.  The court's May 8, 2023 order, although labeled a "Final Judgment," provided:

Judgment is entered in favor of plaintiff and against defendant [GNS] in the amount of $11,912 for earned but unpaid income in 2017 plus attorneys' fees. Plaintiff s former counsel . . . shall file a certification of services within fourteen [] days.

. . . .

Plaintiff is hereby directed to furnish to the court within fourteen . . . days the required certification of legal services in conformance with R[ule] 4:42-9 and R.P.C. 1.5 (a) in order to calculate the attorneys' fees chargeable to GNS.

It is undisputed that at the time of the entry of the May 8, 2023 order, the issue of counsel fees remained outstanding, and the court provided express instructions for the filing of the required attorney certification of fees within fourteen days, which plaintiff did not comply with. On May 28, 2023, however, plaintiff moved for reconsideration of various aspects of the court's May 8, 2023 judgment.

On June 26, 2023, the court denied plaintiff's motion for reconsideration as to the valuation of her equity interest in GNS. The court stated, "plaintiff did not provide the court with a reasonable valuation formula to calculate the fair value of GNS['s] shares." As of this date, the record shows there were two outstanding motions before the court: to compel turnover of GNS's bank account to plaintiff and Fischer and to reinstate GNS as an entity.

The court denied both motions in its August 30 order under Rule 4:49-2. The court reasoned plaintiff's motion for reconsideration was untimely because the June 22 motion was filed forty-five days after the May 8 judgment. Further, the court stated "[plaintiff's motion] did not offer any arguments regarding the court's incorrect reasoning, any arguments that the [c]ourt failed to consider evidence, or any arguments there is good reason for it to reconsider new information."

We are persuaded the August 30 order constitutes a final order for purposes of plaintiff's appeal. An appeal of a final judgment must be filed within forty-five days of its entry. R. 2:4-1(a). Based on our review of the extensive trial and post-trial record, we conclude the May 8, 2023 order was not a final order because the issue of counsel fees remained outstanding. Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017) ("Generally, an order is considered final if it disposes of all issues as to all parties.") (quoting Silviera-Francisco v. Bd. of Educ. of City of Elizabeth, 224 N.J. 126, 136 (2016)). "The time prescription of [Rule 4:49-2] applies only to final judgments and orders." Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:49–2 (2017). Plaintiff's appeal having been filed on September 21, 2023, within forty-five days of the August 30 order, was timely filed.

## B.

We next address plaintiff's argument the court should have appointed an expert to opine on GNS's value under Torres v. Schripps, Inc., 342 N.J. Super. 419, 436 (App. Div. 2001), and Borodinsky v. Borodinsky, 162 N.J. Super. 437, 445 (App. Div. 1978). We are not persuaded either case is relevant to the circumstances before us. Borodinksy is inapposite because the court's holding on valuation was specific to the distribution of ongoing business assets between spouses in the context of divorce. Id. at 443.

In Torres, the court rejected the plaintiff's expert opinion on the value of a closely held corporation and declined to determine its fair value. 342 N.J. Super. at 436. There, we stated, "[w]here the parties fail to present sufficient expert testimony, the trial judge must seek assistance from other sources to aid his decision of fair value," and "[i]n our view, once the trial judge decided to reject the expert's opinion of value, he should have appointed an expert to make a nonbinding report as to the fair value of the corporation." Ibid. Torres, however, involved a corporation and there was no allegation the corporate entity was defunct or lacked value. Rather, "the only issue was the true value of [the corporation]." Id. at 434.

We are persuaded the fact GNS had no value makes it factually distinguishable from Torres, where there was no question the corporation had value and the issue was the true value of the corporation. Here, the court found "[i]t is undisputed that GNS is defunct. There are no assets, no employees, no clients, no revenue or residuals, and no ongoing business," and reasoned that plaintiff improperly based her proposed calculations on her understanding that Simmons was paid $266,000 and Fischer and Caprow were paid $248,000 and $119,000 respectively and surmised that her equity interest was equivalent to Fischer's. Plaintiff's argument regarding the value of her equity shares in GNS is unsupported by the record and contrary to Fischer and Caprow's testimony at trial.

Critically, Fischer and Caprow testified they had never been paid an annual salary of $150,000, and Fischer further acknowledged he did not expect any such payment. Caprow testified he understood the employment agreements were "pro forma documents" that were used to show potential investors and that GNS had no ability to pay any employee $150,000 because there were no substantial clients or income generated. Moreover, Fischer and Caprow acknowledged the employment and operating agreements were essentially tools to incentivize potential investors, and the court referred to the employment

26

agreement as a sham because no employee was ever compensated consistent with its terms. The court also noted GNS's net income was reported as negative $410,474.17.

Against this backdrop, we observe no abuse of discretion in the court's dismissal of plaintiff's claims regarding the value of her GNS shares. An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. INS, 779 F.2d 1260, 1265 (7th Cir. 1985)). We accept the judge's factual finding and conclusion GNS's finances were a sham and conclude the court properly based its decision on sufficient credible evidence in the record. Mohammed, 226 N.J. at 88. And, applying the requisite deferential standard of review, we have no quarrel with the court's reliance on the testimony of GNS's members and evidence to support its conclusion GNS was a defunct entity.

Additionally, plaintiff did not request the court appoint an expert at trial, nor did plaintiff raise this issue in her first motion for reconsideration and, thus, plaintiff cannot establish plain error warranting reversal of the judgment. The plain error standard imposes a high burden to find that the unobjected-to errors

A-0218-23

had a clear capacity to produce an unjust result.  R. 2:10-2; State v. Maloney, 216 N.J. 91, 104 (2013) (citation omitted).  Here, plaintiff cannot satisfy the plain error standard based on the court's alleged failure to appoint an expert to value plaintiff's shares of GNS constitutes error because of the overwhelming evidence produced at trial establishing GNS lacked positive value.

C.

We next address plaintiff's argument the court erred by dismissing her claims against Fischer and Caprow.  Plaintiff also disputes the court's finding there was no basis to pierce the corporate veil.

As the court found, Simmons "controlled GNS with an iron fist," was solely in control of GNS's bank accounts and financial assets, and ran the company into the ground through his self-dealing and financial mismanagement. Plaintiff acknowledged Simmons's deleterious role in her own testimony when she discussed his attempts to gain access to her personal bank account and confronted him regarding his misuse of GNS funds, which led to Simmons physically assaulting plaintiff.  Based on the evidence of Simmons's financial control of GNS and lack of evidence Fischer and Caprow conspired with Simmons, the court's finding and conclusion "plaintiff's classification of . . . Fischer and . . . Caprow as co-conspirators of Simmons [to be] wholly

unsubstantiated," is unassailable. We therefore observe no abuse of discretion on the part of the court in dismissing plaintiff's claims against Fischer and Caprow.

D.

We further observe no support in the record for plaintiff's assertion the court should have appointed a receiver or special fiscal agent to monitor the dissolution of GNS. A custodial or statutory receiver is generally appointed for functioning businesses. See, e.g., Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, P.C. v. Lowenstein Sandler, P.C., 365 N.J. Super. 241 (App. Div. 2003) (cited by plaintiff); Gillies v. Pappas Bros., 138 N.J. Eq. 202 (Ch. 1946) (cited by plaintiff). Based on this record, no purpose would have been served by the appointment of a receiver because there was no dispute GNS was defunct and had any assets, and plaintiff failed to add Simmons' estate as a party.

Lastly, plaintiff argues the court committed plain error when it engaged in an ex parte conference with defense counsel. We have cautioned against excluding self-represented litigants from conferences. See N.J. Div. of Child Prot. & Permanency v. A.O.J., 464 N.J. Super. 21, 48 (App. Div. 2020). Here, the court did not conduct numerous ex parte conferences or outright dismiss the self-represented litigant's concerns. From the record, it appears the conference

was to discuss settlement, as the court specifically stated on the record: "I think it's a good opportunity . . . for us to take a break from the litigation component of our trial and then . . . reevaluate some of our respective positions."

Although Rule 1:2-2 permits settlement discussions to be held off the record, we agree the court should not have excluded plaintiff, a self-represented litigant, from a conference with counsel for codefendants. However, notwithstanding plaintiff's right to participate in the off-the-record conference, we are not convinced the court's error constitutes plain error warranting reversal because it was "clearly capable of producing an unjust result." R. 2:10-2.

Under these circumstances, plaintiff's claims against GNS and codefendants were fully litigated and, as we have previously explained, the court's decision was based on overwhelming evidence in the record.

As to plaintiff's reconsideration motions, the court correctly determined plaintiff failed to address the applicable standard under Rule 4:49-2 or set forth a meritorious basis for relief, and properly denied the motions. To the extent we have not addressed any of plaintiff's arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0218-23